201 P.3d 1056 (2009)
In re the Marriage of Anthony Philip MEREDITH, Petitioner, and
Jazmin Eliana Muriel Suarez Meredith, Respondent.
No. 37098-1-II.
Court of Appeals of Washington, Division 2.
February 18, 2009.
*1058 Anthony Meredith, Irving, CA, Pro Se.
Justin Maxwell Sedell, David Brendan Starks, McKinley Irvin PLLC, Seattle, WA, for Respondent.
QUINN-BRINTNALL, J.
¶ 1 When Anthony Meredith was about 37 years old and a Virginia Assistant Attorney General, he sought a foreign bride on the internet. He contacted a 16-year-old Colombian girl named Jazmin Muriel. When Muriel turned 18, she moved to Virginia and married Meredith. Less than 10 months after the wedding, then-pregnant Muriel fled to Washington State. Meredith petitioned for dissolution and the Pierce County family court granted the petition to dissolve the unhappy and violent marriage, finding that Meredith committed domestic violence and that it was in the best interest of their daughter, Daliana, to remain with Muriel. Meredith appeals, challenging the family court's domestic violence protection order and its parenting plan that limits his contact with Daliana. Although Meredith raises many issues, only two are properly before us for review.[1]
*1059 ¶ 2 In this appeal, we address Meredith's assertions that (1) the order prohibiting Meredith from interfering in Muriel's immigration proceedings violates his First Amendment rights and (2) the family court judge was biased. The record does not support Meredith's bias claim and we affirm the parenting plan. But we remand the domestic violence order to the family court with directions that it be modified to comply with the Supreme Court's decision in In re Marriage of Suggs, 152 Wash.2d 74, 93 P.3d 161 (2004), which prohibits the use of protection orders to restrain lawful speech, and to purge the prior restraint on Meredith's right to petition the government for a redress of grievances. Accordingly, we affirm in part and reverse and remand in part.

Facts

Pretrial Developments
¶ 3 In July 2006, Meredith filed for dissolution in Pierce County and sought custody of his then five-month-old daughter, Daliana. The Pierce County family court held two hearings on the matter. During the first hearing, Muriel had not been afforded the opportunity to prepare a defense. The family court placed Daliana in foster care, stating that it was doing so as a cautionary measure. During the second hearing, Muriel presented her own declaration as well as declarations from other witnesses detailing the ongoing abuse she was suffering at Meredith's hands. The family court ordered that Daliana be returned to her mother's care and that any visitation with her father be supervised. It also limited each visit to two hours.
¶ 4 Immediately after the family court ruling, Meredith began yelling and walking quickly toward Muriel. Fearing violence, an attorney intervened and a judicial assistant summoned security. This outburst caused Muriel's attorney concern for Daliana's safety, so she decided to personally oversee the transfer of Daliana to Muriel.
¶ 5 In addition to the conduct described above, during the dissolution proceedings, Meredith tried to intimidate potential witnesses and falsify evidence. For example, Meredith's father financially supported Muriel during the litigation. Meredith responded by threatening to sue his father and telling his father that he intended to sue anyone who filed declarations on Muriel's behalf. Meredith also asked a priest to sign a declaration purportedly authored by the priest. Because the priest did not have input in preparing the declaration, he refused to sign it and told the family court about Meredith's behavior.
¶ 6 On another occasion, Meredith called 911 and took Daliana to a hospital, alleging that Daliana was underweight and that Muriel had been abusing her. Lakewood Police Officer John Neal investigated the allegations. Neal suspected that Meredith had sought medical attention for Daliana only to gain an advantage in litigation. Neal also noted that, during their interview, Meredith flashed his badge, announced that he was an assistant attorney general in Virginia, and said his wife hailed from the murder capital of the world. The police officer, social worker, and physicians who examined Daliana concluded that she was a healthy, happy, normal-weight child who had not been abused.
¶ 7 Meredith again sought custody, alleging that Muriel was promiscuous, sexually perverted and immoral, and that she had abused Daliana. On March 15, 2007, the family court denied Meredith's motion to modify custody. The family court also awarded Muriel her attorney fees. Meredith moved, unsuccessfully, to revise the March 15 order.
¶ 8 At Muriel's request, the family court ordered both parties to submit to mental health examinations under CR 35. The mental health examiner concluded that Meredith was dangerous. Meredith moved again to remove the visitation restrictions but the family court denied his motion.

*1060 Trial
¶ 9 Trial on Meredith's petition for dissolution began on October 1, 2007. After hearing extensive testimony and reviewing numerous declarations and exhibits, the family court entered orders in Muriel's favor. Finding that Meredith was not a credible witness and that Muriel was a credible witness, the family court concluded that Meredith had physically and sexually assaulted Muriel, causing great bodily harm or fear of such, and that the pattern of domestic violence could harm Daliana. It also found that Meredith's interest in Daliana was designed to gain control over Muriel and that he had taken several actions, including trying to have Muriel deported while pregnant and falsely reporting that Muriel abused Daliana, that were not in Daliana's best interest. In deciding Daliana's best interests, the family court found that Muriel is a good mother and that Daliana was healthy and well-cared for.
¶ 10 A separate order allowed Muriel to obtain a passport for Daliana and travel with her without Meredith's permission. The parenting plan gave Muriel primary custody and restricted Meredith's contact with Daliana. The family court based this decision on its findings that Meredith committed acts of domestic violence under RCW 26.09.191(1) and (2) and engaged in the abusive use of conflict under RCW 26.09.191(3).
¶ 11 The family court also entered a permanent domestic violence protection order based on its finding that Meredith "committed domestic violence as defined in RCW 26.50.010 and represents a credible threat to the physical safety of [Muriel]." 4 Clerk's Papers (CP) at 616. In addition, the protection order restrained Meredith from
contacting any agency regarding Ms. Muriel's immigration status, including but not limited to the Department of Homeland Security (Citizenship and Immigration Services, Immigration and Customs Enforcement or Customs and Border Protection), the Executive Office of Immigration Review (the immigration court system), or the Department of State. Any contact that Mr. Meredith believes to be necessary must first be approved by this court through the undersigned judge/department.
4 CP at 618.
¶ 12 After the family court entered the orders, Meredith filed a motion demanding that the judge recuse herself from the case because she supported an immigrant rights organization and showed bias toward Muriel. The family court denied this motion and awarded Muriel her attorney fees and costs.
¶ 13 Meredith appeals.[2]

Analysis
Prohibition on Reporting To Immigration Authorities
¶ 14 Citing only the federal and state constitutions, Meredith asserts that the family court's order prohibiting him from interfering with Muriel's immigration proceedings violates his free speech rights. Again, the order at issue prohibits Meredith from
contacting any agency regarding Ms. Muriel's immigration status, including but not limited to the Department of Homeland Security (Citizenship and Immigration Services, Immigration and Customs Enforcement or Customs and Border Protection), the Executive Office of Immigration Review (the immigration court system), or the Department of State. Any contact that Mr. Meredith believes to be necessary must first be approved by this court through the undersigned judge/department.
4 CP at 618. Although we disagree with Meredith's vitriolic and incendiary language, we agree that the family court's order is an unconstitutional prior restraint on Meredith's federal[3] First Amendment rights to free *1061 speech and to petition the government for a redress of grievances.
¶ 15 The First Amendment of the United States Constitution prohibits the government from interfering with a person's "freedom of speech" and "right ... to petition the Government for a redress of grievances." See also United States Const., amend. 14, § 1 (making First Amendment applicable to states). Although the right to free speech and the right to petition are separate guarantees, they are related and generally subject to the same constitutional analysis. Wayte v. United States, 470 U.S. 598, 611 n. 11, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (citing Nat'l Assoc. for the Advancement of Colored People v. Claiborne Hardware Co., 458 U.S. 886, 911-15, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982)). We address each First Amendment argument in turn.

A. Free Speech
¶ 16 The United States Supreme Court defines prior restraints on free speech as
administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur. Temporary restraining orders and permanent injunctions i.e., court orders that actually forbid speech activities  are classic examples of prior restraints.
Suggs, 152 Wash.2d at 81, 93 P.3d 161 (citations and internal quotation marks omitted) (quoting Alexander v. United States, 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993)). "Prior restraints carry a heavy presumption of unconstitutionality." Suggs, 152 Wash.2d at 81, 93 P.3d 161 (citing Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963)). Accordingly, prior restraints are permitted in only "exceptional cases such as war, obscenity, and `incitements to acts of violence and the overthrow by force of orderly government.'" Suggs, 152 Wash.2d at 81, 93 P.3d 161 (quoting Near v. Minnesota ex rel. Olson, 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357 (1931)).
¶ 17 Muriel argues that this restraining order is not a prior restraint because the family court entered it in response to Meredith's past attempts to have Muriel deported. Instead, she argues that this is a permissible post-speech restriction "after a showing of abuse" of the right to speak. Bering v. SHARE, 106 Wash.2d 212, 243, 721 P.2d 918 (1986), cert. dismissed, 479 U.S. 1050, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987). We disagree. First, the family court did not find that Meredith abused his right to speak. Meredith had the right, as does everyone in this country, to make a valid report to government authorities regarding Muriel's presence in the country. The problem with this report, the family court found, was that it demonstrated that Meredith was not acting in Daliana's best interest  Muriel was pregnant at the time and would potentially be deported to Colombia with her mother. Moreover, the family court did not conclude that Meredith abused his right to speak as it relates to this restraining order.[4] Here, the order is clearly a prior restraint that forbids Meredith from speaking in the future. See Suggs, 152 Wash.2d at 81, 93 P.3d 161.
¶ 18 In Suggs, the trial court found that Shawn Suggs harassed her former husband, Andrew Hamilton, and then permanently restrained her from "knowingly and willfully making invalid and unsubstantiated allegations or complaints to third parties which are designed for the purpose of annoying, harassing, vexing, or otherwise harming Andrew O. Hamilton and for no lawful purpose." 152 Wash.2d at 77-79, 93 P.3d 161. Upon review, our Supreme Court noted that some of the speech that the order prohibited might be unprotected libelous speech, but the order also prohibits speech that is protected under the First Amendment. Suggs, 152 Wash.2d at 83-84, 93 P.3d 161. Because the order was drafted too broadly, the court reasoned, it chilled Suggs from making communications that the First Amendment protects. Suggs, *1062 152 Wash.2d at 84, 93 P.3d 161. Accordingly, our Supreme Court vacated the order as violating the prohibition on prior restraints. Suggs, 152 Wash.2d at 84, 93 P.3d 161.
¶ 19 Similarly, here, although the order prohibits Meredith from making harassing and libelous claims against Muriel, it goes much further than even the order in Suggs. The order here prohibits Meredith from "contacting any agency regarding Ms. Muriel's immigration status" without prior court approval, without regard to whether the contact involves protected or unprotected speech. 4 CP at 618. For instance, this order chills Meredith from giving a true factual account of his role in Muriel's immigration to the United States and it prohibits Meredith from advocating that Muriel be allowed to stay in the United States in order to facilitate his relationship with Daliana. The order also prohibits Meredith from making a legitimate criminal report, an issue discussed below. This order is not specifically crafted to prohibit only unprotected speech and, as such, it is an unconstitutional prior restraint under Suggs.[5] 152 Wash.2d at 84, 93 P.3d 161.

B. Prior Restraint on Right To Petition the Government
¶ 20 Further, this order is unconstitutional because it is a prior restraint on Meredith's First Amendment right to petition the government for a redress of grievances. "[T]he right to petition extends to all departments of the [g]overnment." Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). Thus, the right to petition includes the rights to (1) "`complain to public officials and to seek administrative and judicial relief,'" Jackson v. New York State, 381 F.Supp.2d 80, 89 (N.D.N.Y.2005) (quoting Gagliardi v. Village of Pawling, 18 F.3d 188, 194 (2d Cir.1994)); (2) petition "any department of the government, including state administrative agencies," Ctr. for United Labor Action v. Consol. Edison Co., 376 F.Supp. 699, 701 (S.D.N.Y.1974); and (3) file a legitimate criminal complaint with law enforcement officers.[6]
¶ 21 As with the right to speak freely, the right to petition does not protect harassing or libelous speech.[7]State v. Alphonse, 147 Wash.App. 891, 197 P.3d 1211 (2008), illustrates this point.
¶ 22 Edison Alphonse was convicted of felony and misdemeanor telephone harassment of a police officer. In Alphonse, we noted that the petition clause "protects a significant amount of verbal criticism and challenge directed at police officers." 147 Wash.App. 891, 197 P.3d 1211. But we denied Alphonse's petition clause challenge because his conviction rested on harassing speech. Alphonse voiced some concern over the officer's investigation, but his conviction was for speech made with the "intent to harass, intimidate, torment or embarrass" the officer, including death threats and graphic sexual statements about the officer's wife. Alphonse, 147 Wash.App. 891, 197 P.3d 1211. Thus, we held that the conviction did not violate the petition clause because the communication for which Alphonse was convicted was unprotected harassment. Alphonse, 147 Wash.App. 891, 197 P.3d 1211.
¶ 23 But a citizen does not lose the right to petition the government merely because his communication to the government contains some harassing or libelous statements. *1063 In one relevant case, a group of parents petitioned their school board to fire a teacher, engaging in "vehement and continuing protests, based on unfounded rumors" about the teacher. Stachura v. Truszkowski, 763 F.2d 211, 213 (6th Cir.1985), rev'd on other grounds by Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). The Sixth Circuit Court of Appeals held that the teacher who organized the event was immune from civil liability because she had the right to initiate government protests intended to accomplish an ostensible goal of persuading the school board to fire the teacher. Stachura, 763 F.2d at 213. It was irrelevant to her right to petition whether the petitions included some libel and harassment; as a whole, they were for a legitimate purpose and, thus, were protected under the petitions' clause. Stachura, 763 F.2d at 213.
¶ 24 Similarly, in Eaton v. Newport Board of Education, 975 F.2d 292, 298 (6th Cir. 1992), cert. denied, 508 U.S. 957, 113 S.Ct. 2459, 124 L.Ed.2d 674 (1993), the Sixth Circuit reasoned that it was irrelevant whether a teachers union's complaints were "reasonable or fair" when it lobbied the school board to discipline a principal. The court held that the petition clause protected the lobbying because the union did not use the process "merely to harass"[8] the principal. Eaton, 975 F.2d at 298 (citing Omni Outdoor Advertising, 499 U.S. at 380, 111 S.Ct. 1344; Opdyke Inv. Co. v. City of Detroit, 883 F.2d 1265, 1273 (6th Cir.1989)).
¶ 25 In a case very similar to the one before us, the South Dakota Supreme Court struck a protection order because it violated the petitions' clause. In Hobart v. Ferebee, 2004 SD 138, 692 N.W.2d 509, the defendant, George Ferebee, had filed numerous complaints to government authorities against his neighboring rancher, Steven Hobart. "Most of Ferebee's complaints were transparent attempts to make life as difficult as possible for Hobart." Hobart, 692 N.W.2d at 512. Hobart obtained court orders to protect him from Ferebee's harassment, including an order that Ferebee may not make any complaint regarding Hobart to a county, federal, or state agency unless he first paid a $25 fee and obtained permission from the circuit court. Hobart, 692 N.W.2d at 512. The South Dakota Supreme Court struck the restraining order, holding that it was an unconstitutional prior restraint on speech that violated the right to petition and was overbroad because it prohibited both harassing and protected speech. Hobart, 692 N.W.2d 509.
¶ 26 Here, it is possible that Meredith would make harassing or libelous statements about Muriel if he contacted a government agency regarding her immigration status. Indeed, his pleadings and briefs are rife with such unprotected speech, including attacks on Muriel's alleged sexual behavior and claims that she abused Daliana. But the First Amendment's petition clause prohibits courts from denying a citizen access to the government based on speculation that the citizen will use such access in order to harass or commit libel. We may not deny Meredith access to our court on the basis that his briefs contain some unprotected and unprofessional communications because, as a whole, he filed this appeal for the legitimate purpose of seeking judicial review of a lower court decision by which he was aggrieved. See Addleman, 139 Wash.2d at 753-54, 991 P.2d 1123. Similarly, a lower court may not institute a sweeping prior restraint of government petitions based on Meredith's past bad deeds. The challenged order, as crafted, is a prior restraint that prohibits both protected and unprotected speech and petitions. Accordingly, it violates both the free speech and petitions clauses of the First Amendment and we are bound to vacate it.

C. Remedy
¶ 27 We vacate this order and remand to the family court for modification. Upon remand, *1064 the family court may craft a narrowly tailored order that is tied to its specific factual findings regarding Meredith's harassing and libelous behavior. For example, the family court found that Meredith's accusation that Muriel abused Daliana before and during trial were false. The First Amendment does not protect further dissemination of this false accusation and, therefore, the family court may restrain Meredith from repeating this false accusation to anyone in the future. But the court may not enter a prior restraint on protected speech nor deny Meredith access to the government simply because it fears he will engage in unprotected communications. Government agencies are tasked with addressing citizens' petitions and may freely weigh any complaint that Meredith may make against evidence that the family court concluded that Meredith repeatedly committed domestic violence and made false accusations against Muriel. Moreover, such agencies are fully capable of sanctioning Meredith should he commit libel, perjury, or attempt to use government complaints to harass Muriel.

Judicial Bias
¶ 28 Meredith next claims that the family court judge was biased. The record does not support his claim and we disagree.
¶ 29 We review a trial court's denial of a motion that it recuse for an abuse of discretion. Wolfkill Feed & Fertilizer Corp. v. Martin, 103 Wash.App. 836, 840, 14 P.3d 877 (2000). Due process, the appearance of fairness, and Canon 3(D)(1) of the Code of Judicial Conduct (CJC) require that a judge disqualify from hearing a case if that judge is biased against a party or if his or her impartiality may be reasonably questioned. Wolfkill, 103 Wash.App. at 841, 14 P.3d 877 (citing State v. Dominguez, 81 Wash.App. 325, 328, 914 P.2d 141 (1996)). A trial court is presumed to perform its functions regularly and properly without bias or prejudice. Wolfkill, 103 Wash.App. at 841, 14 P.3d 877 (citing Kay Corp. v. Anderson, 72 Wash.2d 879, 885, 436 P.2d 459 (1967)).
¶ 30 The appearance of fairness doctrine seeks to insure public confidence by preventing a biased or potentially interested judge from ruling on a case. See State v. Carter, 77 Wash.App. 8, 12, 888 P.2d 1230 (citing State v. Post, 118 Wash.2d 596, 619, 826 P.2d 172, 837 P.2d 599 (1992)), review denied, 126 Wash.2d 1026, 896 P.2d 64 (1995). Evidence of a judge's actual or potential bias is required. Post, 118 Wash.2d at 619, 826 P.2d 172. Under the appearance of fairness doctrine, a judicial proceeding is valid only if a reasonably prudent and disinterested person would conclude that all parties obtained a fair, impartial, and neutral hearing. State v. Bilal, 77 Wash.App. 720, 722, 893 P.2d 674, review denied, 127 Wash.2d 1013, 902 P.2d 163 (1995).
¶ 31 Here, Meredith was required to present evidence that the judge who presided over the dissolution proceedings was biased. Post, 118 Wash.2d at 619, 826 P.2d 172. He did not. Instead, he made bald accusations. Meredith argued that the judge was biased because she (1) donated money to the Northwest Immigrant Rights Project (NWIRP) and (2) questioned Muriel's immigration attorney about Muriel's deportation status.
¶ 32 Meredith's claim that the judge made financial contributions to NWIRP is unsupported by any evidence in the record. Meredith asks us to take judicial notice of information contained on internet sites of immigrant rights organizations. But judicial notice of adjudicative facts is proper only if the fact is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the ... court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." ER 201(b). Information contained on these internet sites are not "generally known" or from a "source[] whose accuracy cannot reasonably be questioned." ER 201(b).
¶ 33 Moreover, it does not follow that, because someone makes a financial contribution to an immigration rights organization, that person would be biased in favor of all immigrant parties appearing in the litigation before it. We question strongly Meredith's assertion that a judge's financial contribution to a non-profit organization demonstrates bias. See CJC Canon 4, Comment (judges *1065 are encouraged to work towards improvements in the law but may not lend their prestige of office while doing so); CJC Canon 5(B) ("[j]udges may participate in civic and charitable activities that do not reflect adversely upon their impartiality or interfere with the performance of their judicial duties"); Allen v. State, 737 N.E.2d 741, 744-45 (Ind.2000) (a judge's participation in organization devoted to preventing domestic abuse and providing shelter to its victims did not cause bias in presiding over a domestic violence case). But we decline to rule on the merits of Meredith's bias claim because the information on which it rests lies outside the scope of our appellate record.
¶ 34 Meredith's second basis for his bias claim is that the judge showed bias when questioning a witness, Muriel's immigration attorney. That portion of the record reads, in pertinent part:
Q So is there some type of [immigration] hearing or proceeding that's scheduled here in the future?
. . . .
Q Mr. Meredith has already testified that he's had contact with several different people in the process; I think, primarily, the investigator. Also, the guardian ad litem has had contact with the investigator, as well as a couple of people from the adjudicative side. Is it likely that there would be a hearing where they would ask for Mr. Meredith to testify?
A No. [The immigration attorney explains that the proceedings are typically done through written documentation, not live testimony and, even if Muriel were awaiting deportation, the immigration judge would probably not ask Meredith to testify.]
Q Is there any other way that she can pursue legal immigration status, besides the Violence Against Women Act? The fact that her child is born here?
A Not at this time, no....
Q And then my one other question is, given that you don't know when [the immigration process] will necessarily be resolved, if she was to move, relocate to Maryland, would that interfere with this immigration process? Does she need to stay in Western Washington?
A Personally, as my own professional choice and opinion on that is I like my clients to stay put, but technically, no, it doesn't interfere with the process.
5 Report of Proceedings at 506-09.
¶ 35 Meredith characterizes this dialogue as showing the judge's bias for immigrants and an attempt to help Muriel with her immigration proceedings. But the judge's questions are clearly relevant to pending issues that the court had to resolve, including whether it was in the child's best interest to stay in Washington or be allowed to move to Maryland, given Muriel's argument that it was in her child's best interest if Muriel was not deported to Colombia but, instead, obtained a green card and could work in the United States. These questions were also relevant to addressing Muriel's request that the domestic violence protective order prohibit Meredith from interfering with Muriel's immigration proceedings.
¶ 36 Accordingly, the portion of the record Meredith relies on to show judicial bias does not support his claim and, in light of the issues before the family court, would not cause a reasonably prudent and disinterested person to conclude that the judge was biased in favor of immigrants and that, as a result of this bias, the parties did not obtain a fair, impartial, and neutral hearing. See Bilal, 77 Wash.App. at 722, 893 P.2d 674. The family court did not abuse its discretion by denying Meredith's motion that it recuse.

Attorney Fees on Appeal
¶ 37 Muriel requests attorney fees and costs on appeal for a frivolous appeal under RAP 18.9. An appeal is frivolous when, considering the record in its entirety and resolving all doubts in favor of the appellant, no debatable issues are presented upon which reasonable minds might differ; i.e., it is so devoid of merit that no reasonable possibility of reversal exists. Brin v. Stutzman, 89 Wash.App. 809, 828, 951 P.2d 291, review denied, 136 Wash.2d 1004, 966 P.2d 901 (1998). Meredith has prevailed on his First Amendment challenge and, thus, his *1066 appeal is not totally devoid of merit.[9] We deny the request for fees.
¶ 38 We affirm the parenting plan and denial of the recusal motion, but reverse and remand the domestic violence order to be modified as required under Suggs, 152 Wash.2d 74, 93 P.3d 161.
We concur: BRIDGEWATER, J., and PENOYAR, A.C.J.
NOTES
[1] The bulk of the arguments on appeal are based on Meredith's theory that the family court judge should have found his evidence more credible and persuasive than Muriel's. But we do not make credibility determinations or weigh evidence. Morse v. Antonellis, 149 Wash.2d 572, 574, 70 P.3d 125 (2003); Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wash.2d 873, 879-80, 73 P.3d 369 (2003). Meredith also argues that the family court's ruling violated his constitutional rights as a parent; we do not consider this issue because he fails to support it in any way beyond his claims of the credibility and persuasiveness of evidence. See Saunders v. Lloyd's of London, 113 Wash.2d 330, 345, 779 P.2d 249 (1989) (we will not consider issues, particularly complex ones, "[a]bsent adequate, cogent argument and briefing"). In addition, Meredith argues that the trial court's ruling "emboldened Jazmin Muriel to deny [Meredith] access to Daliana's health care records in violation of RCW 26.09.255." Br. of Appellant at 26. But this issue is clearly outside the proper scope of our appellate review, which is limited to the family court's orders and not any tangential consequences of those orders. Moreover, Meredith does not cite to the record for the factual basis of this claim and our independent review of the record reveals no support. See RAP 10.3(a)(6) (requiring argument in support of issues presented for review together with citations to legal authority and references to the relevant part of the record).
[2] Meredith filed two notices of appeal, one for the parenting plan and protection orders and another for the order that awarded attorney fees and the denial of the recusal motion. Meredith does not argue that attorney fees were improperly awarded below and, therefore, has waived appeal of that issue.
[3] Meredith also asserts that the order violates the state constitution, but we may not consider that claim because he fails to brief the State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986), factors. Suggs, 152 Wash.2d at 80, 93 P.3d 161 (declining to address nearly identical state constitutional claim due to parties' failure to brief the Gunwall factors) (citing State v. Dhaliwal, 150 Wash.2d 559, 575-76, 79 P.3d 432 (2003); Gunwall, 106 Wash.2d 54, 720 P.2d 808).
[4] Meredith's false police report of abuse may support such a conclusion, but that issue is not now before this court.
[5] Muriel argues that Suggs is inapposite because the restraining order in that case was not issued under the Domestic Violence Prevention Act, ch. 26.50 RCW, and our courts have upheld that Act from a variety of constitutional challenges. But the question before us is not whether the Act is facially unconstitutional but, rather, whether the restraining order, which the family court crafted for this case, violates the First Amendment.
[6] Jackson, 381 F.Supp.2d at 89 (law enforcement); Gagliardi, 18 F.3d at 194 (public officials, administrative and judicial relief); United States v. Hylton, 558 F.Supp. 872, 874 (S.D.Tex.1982) (law enforcement), aff'd, 710 F.2d 1106 (5th Cir. 1983); Ctr. for United Labor Action, 376 F.Supp. 699 (administrative agencies); In re Pers. Restraint of Addleman, 139 Wash.2d 751, 753-54, 991 P.2d 1123 (2000) (access to courts).
[7] McDonald v. Smith, 472 U.S. 479, 483, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985) (petition clause does not provide an absolute immunity from damages for libel and defamation); Richmond v. Thompson, 130 Wash.2d 368, 378, 922 P.2d 1343 (1996) (same).
[8] The Eaton court was referring here to the "sham" exception to the public lobbying doctrine, which does not apply in the present case because Meredith is not a business entity that can lobby. See Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 380, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). The principle remains the same, however, that one may not ban or punish government petitions simply because they overstep into unprotected behavior. See Stachura, 763 F.2d at 213.
[9] Muriel did not request fees under RCW 26.09.140.