IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Marriage of CAROLINE MARIA CAYLOR, | ) ) ) | No. 73404-1-I |
| Appellant, | ) ) | |
| | ) | UNPUBLISHED OPINION |
| and | ) ) | |
| NATHANIEL THOMAS CAYLOR, | ) ) | |
| Respondent. | ) ) | FILED: May 16, 2016 |

2016 MAY 16 AM 10: 14
COURT OF APPEALS DIV 1
STATE OF WASHINGTON
FILED

SCHINDLER, J. — Caroline Maria Vaughan appeals the decree of dissolution, final parenting plan, findings of fact and conclusions of law, and the order of child support. Vaughan contends the provision in the parenting plan and the order of child support that prohibits her from "providing negative information about the father to day care providers, school personnel, or other parents associated with the child or child's friends" violates her First Amendment right to free speech. Vaughan also challenges the parenting plan residential provisions, the decision of the court to exclude a letter as hearsay, and the award of $30,000 in attorney fees based on intransigence. We conclude the record supports the court's decision to impose a provision in the parenting plan and the order of child support prohibiting Vaughan from engaging in unprotected speech but vacate and remand to craft a provision that prohibits only unprotected speech. In all other respects, we affirm.

## FACTS

In spring 2012, Caroline Maria Vaughan and Nathaniel Thomas Caylor were living in the same apartment complex. Caylor lived with his five-year-old son. Caylor sustained a serious facial injury in 2009 and had a metal device that was screwed into his jaw. In 2011, Caylor sustained a back injury while working as a high-rise window washer.

In April 2012, Vaughan and Caylor started spending time together. Vaughan thought Caylor was "very nice" and "charming." When Caylor and Vaughan met in April 2012, Vaughan worked in sales for a wine and alcohol distributer.

Caylor told Vaughan that shortly after the mother of Caylor's son died in 2009, a family member called the police concerned about Caylor's mental state. Police went to the apartment to conduct a welfare check. Caylor was in the apartment with his son. Caylor refused to allow the police to enter. Believing Caylor was armed and dangerous, a Seattle police officer shot him, causing extensive and serious injuries to his face and jaw. Caylor was not armed and no weapons were found at the apartment.

Child Protective Services removed Caylor's son from his custody and filed a dependency petition. Caylor entered an Alford[1] plea to the felony harassment charge. After Caylor successfully completed a number of services including a psychological evaluation and therapy, the State returned Caylor's son to his care and dismissed the dependency petition.

Caylor filed a civil lawsuit against the city of Seattle (City) based on the shooting, the multiple surgeries stemming from the shooting, and the removal of his child.

---

[1] North Carolina v. Alford, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

Caylor and Vaughan married in July 2012. Vaughan was pregnant at the time. A few weeks after the wedding, Caylor underwent major surgery to reconstruct his jaw with a bone graft. Caylor was hospitalized for several weeks. Physicians prescribed high-level pain medication after the procedure. While Caylor was hospitalized, Vaughan suffered a miscarriage.

Caylor's parents arrived from Idaho to help care for Caylor and his son. When Caylor returned home from the hospital, Vaughan was not interested in caring for Caylor or his son but insisted Caylor's parents leave.

In November, Vaughan was pregnant.

On January 25, 2013, Caylor and Vaughan argued. Caylor took Vaughan's cell phone because his was broken and tried to leave. Vaughan confronted him. Caylor said Vaughan "was charging at me. She was getting in my face. She was pushing me." As he was driving his truck away from the house, Vaughan came "screaming out of the house at [Caylor]." Vaughan stepped on the running board and reached inside the truck through an open window to hit him in the face. Vaughan started "punching" Caylor's face and "clawing at" his arm. As Caylor tried to roll up the window, Vaughan grabbed the door handle, broke it off, and fell.

> She started hitting at me. Yeah. This is a very emotionally charged thing, so just give me a moment here. So she charged in and climbed on the car and started punching at me and like clawing at me. And she reached in. And I was trying to get her away and holding my hand up because she kept hitting me in the head. And I tried to roll the window up with my hand up. She reached in to grab the door knob. She broke the door knob off and fell off the car.

Caylor drove a short distance and called the attorney who was representing him in the case against the City for help.

3

The attorney found Caylor parked in the truck approximately four blocks away from his house, very weak and "shaken." Caylor had a PICC[2] line in his arm for "intravenous antibiotics and intravenous pain medication."

Q:    How did [Caylor] appear to you?
A:    Very shaken. I mean literally shaking. He was trembling and very sad.
Q:    And how did you know he was sad?
A:    A couple things. One would be just his facial expressions and affect. And I believe he was tearful. The other is that I actually have a background before law of working in mental health, and I would certainly have assessed him as being depressed, and acutely so.
Q:    And how would you describe his physical condition, his weight?
A:    He was very evidently weak. And as the morning got on and as he got out of the vehicle and I spoke with him and then did some additional things with him, it was very evident he was weak. I knew that he had just had a surgery recently. He was walking with a cane. And I understood that the surgery had been to take a bone graft from somewhere in his leg or hip to use in trying to reconstruct his mouth that had been damaged by the shooting.

Caylor and the attorney went back to the house to retrieve some belongings and Caylor's medication. Vaughan was not there. They found the medication "outside in a garbage can on the curb." The attorney took Caylor and his son to a hotel and to a scheduled medical appointment. "[Caylor] was very distraught . . . , trying to figure out what would be next. . . . He was moving slowly, was pale, and was at times tearful, and his general bearing was of a person who was not at all well." A few days later, the attorney helped Caylor move out of the house.

On February 28, 2013, Vaughan filed a petition for dissolution of the marriage. Vaughan did not allege domestic violence or seek a restraining order.

---

[2] Peripherally inserted central catheter.

4

Caylor went to Idaho with his son to stay with his parents. Caylor and his son returned to Port Townsend, Washington around May 2013. In August 2013, Vaughan gave birth to a daughter.

In January 2014, Vaughan obtained a decree of dissolution, findings of fact and conclusions of law, an order of child support, and a parenting plan by default. Caylor filed a motion to vacate the default orders. Vaughan filed a declaration in opposition to the motion. Vaughan claimed Caylor assaulted her on January 25, 2013 by grabbing her arm and causing a bruise. Vaughan alleged Caylor took her cell phone to prevent her from calling the police and threatened to run her over. In a supplemental declaration, Vaughan said Caylor waived a hunting knife at her and rolled up the car window on her arm after she reached inside the vehicle.

The court granted Caylor's motion to vacate entry of the decree of dissolution, findings of fact and conclusions of law, order of child support, and parenting plan, and set the case for trial.

Vaughan did not answer interrogatories or respond to requests for production, and did not appear at her deposition despite a court order to do so. Vaughan interfered with Caylor's attempt to depose witnesses and provided a false name for a day care provider. The court found Vaughan's intransigence resulted in additional legal fees and costs. The court ordered Vaughan to appear for her deposition and comply with discovery by a specific date, and awarded Caylor $2,500.

Around the same time, Vaughan filed a motion for a protection order. In December 2014, a court commissioner pro tem entered a protection order. Caylor filed

a motion to revise the commissioner's decision. The parties agreed the court should consider the motion to revise as part of the trial.

The six-day trial began on January 12, 2015. Vaughan and Caylor were represented by counsel at trial. A number of witnesses testified including Vaughan, Vaughan's father, Caylor, Caylor's parents, a Family Court Services social worker, a Seattle police officer involved in the 2009 shooting, and the attorney who represented Caylor in the civil suit against the City.

At the conclusion of the trial, the court entered the decree of dissolution, final parenting plan, findings of fact and conclusions of law, and order of child support. The parenting plan designates Vaughan as the residential parent but gives Caylor gradual and increasing residential time with the child. The court entered an order granting the motion to revise and dismissed the protection order.[3]

## ANALYSIS

### Parenting Plan and Child Support Order Provisions

Vaughan contends the provision in the parenting plan and order of child support violates her constitutional right to free speech under the First Amendment of the United States Constitution. Vaughan argues the provision that prohibits her from "providing negative information" to third parties is overly broad and impermissibly restricts her ability to communicate.

---

[3] Vaughan assigns error to the court's ruling on revision and order dismissing the protection order, but she did not appeal the orders and does not specifically address the claimed errors in her briefing on appeal. Vaughan also challenges several of the court's findings of fact but, with the exception of one finding, does not provide argument in support of the claims of error. See RAP 10.3(a)(6); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 819, 828 P.2d 549 (1992) (we will not consider arguments not supported by reference to the record and citation to authority).

The parenting plan states Vaughan "shall be prohibited from providing negative information about the father to day care providers, school personnel, or other parents associated with the child or child's friends." The order of child support states Caylor "shall be entitled to communicate directly with this daycare provider. If the mother has told the daycare provider any negative information about the father, or allegations about the father, she shall cease doing so immediately."

The First Amendment prohibits the government from interfering with "freedom of speech." However, the First Amendment " 'does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired.' " Bering v. Share, 106 Wn.2d 212, 222, 721 P.2d 918 (1986) (quoting Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 647, 101 S. Ct. 2559, 69 L. Ed. 2d 298 (1981)). The court has the authority to prohibit dissemination of abusive speech including defamation and harassment. Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72, 62 S. Ct. 766, 86 L. Ed. 1031 (1942); Bering, 106 Wn.2d at 243-45; Rhinehart v. Seattle Times Co., 98 Wn.2d 226, 237, 654 P.2d 673 (1982).

Prior restraints, or official restrictions imposed upon speech in advance, are disfavored because they burden the exercise of the right to speak before any abuse of the right has occurred. State v. Noah, 103 Wn. App. 29, 41, 9 P.3d 858 (2000); City of Seattle v. Bittner, 81 Wn.2d 747, 756-57, 505 P.2d 126 (1973).

Even where the welfare of a child is of paramount concern, prior restraints on speech based on content presumptively violate the First Amendment. Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S. Ct. 631, 9 L. Ed. 2d 584 (1963); In re Marriage of Olson, 69 Wn. App. 621, 630, 850 P.2d 527 (1993); In re Marriage of Suggs, 152

Wn.2d 74, 80-81, 93 P.3d 161 (2004). Our courts have upheld restrictions in such cases only where the restriction (1) prohibits only speech that is not entitled to constitutional protection and (2) serves the best interest of the children. See Olson, 69 Wn. App. at 630 (restrictions on "disparaging remarks" were not unconstitutional because defamatory remarks are not protected by the First Amendment).

In Suggs, the trial court found Suggs harassed her former husband. Suggs, 152 Wn.2d at 78-79. The court permanently restrained her from " 'knowingly and willfully making invalid and unsubstantiated allegations or complaints to third parties which are designed for the purpose of annoying, harassing, vexing, or otherwise harming [her former husband] and for no lawful purpose.' " Suggs, 152 Wn.2d at 78-79. Our Supreme Court concluded the order prohibited some speech that might be unprotected but also encompassed protected speech. Suggs, 152 Wn.2d at 83-84. Because the order lacked the necessary specificity, the court vacated the order as an "unconstitutional prior restraint on speech." Suggs, 152 Wn.2d at 84.

Similarly, in In re Marriage of Meredith, 148 Wn. App. 887, 894-95, 201 P.3d 1056 (2009), the trial court found that Meredith committed domestic violence and was a credible threat to the safety of his former spouse. The trial court required Meredith to obtain prior court approval before contacting any agency about the immigration status of his former spouse. Meredith, 148 Wn. App. at 895. The protection order stated, in pertinent part:

> [Meredith is restrained from] contacting any agency regarding [his former spouse]'s immigration status, including but not limited to the Department of Homeland Security (Citizenship and Immigration Services, Immigration and Customs Enforcement or Customs and Border Protection), the Executive Office of Immigration Review (the immigration court system), or the Department of State. Any contact that Mr. Meredith believes to be

necessary must first be approved by this court through the undersigned judge/department.

Meredith, 148 Wn. App. at 895.[4]

On appeal, we concluded the order was an unconstitutional prior restraint on Meredith's constitutional right to free speech because it did not distinguish between protected and unprotected speech. Meredith, 148 Wn. App. at 896. Although the order appropriately prohibited Meredith from making harassing and libelous claims, it also prohibited him from "contacting any agency" without prior court approval and "without regard to whether the contact involves protected or unprotected speech." Meredith, 148 Wn. App. at 895, 898.[5] We concluded that because the order was not "specifically crafted to prohibit only unprotected speech," it was an unconstitutional prior restraint. Meredith, 148 Wn. App. at 898.

Here, the record establishes Vaughan made "continual statements to third parties" that Caylor committed physical assault and engaged in the unauthorized use of narcotics. There is no question the court has authority to restrain Vaughan from making unfounded defamatory statements about the father. See Olson, 69 Wn. App. at 630. But the provisions in the parenting plan and order of child support are not carefully crafted to distinguish between protected and unprotected speech and to prohibit only unprotected speech. We also conclude the provision in the parenting plan that states, "Neither parent shall make negative comments about the other or any aspect of these legal proceedings nor shall he or she allow the child to be on or near third parties making such comments" suffers from the same infirmity. We vacate these provisions and remand to craft provisions that prohibit only unprotected speech.

---

[4] Emphasis in original, internal quotation marks omitted.

[5] Emphasis in original, internal quotation marks omitted.

Residential Provisions

Vaughan challenges the parenting plan residential schedule. We review a trial court's parenting plan for an abuse of discretion. In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). A trial court abuses its discretion when "a decision is manifestly unreasonable or based on untenable grounds or untenable reasons." Katare, 175 Wn.2d at 35. Because of its unique opportunity to observe the parties, we defer to the trial court to determine their credibility and sort out conflicting evidence. In re Marriage of Woffinden, 33 Wn. App. 326, 330, 654 P.2d 1219 (1982).

In establishing a residential schedule, RCW 26.09.187(3)(a) identifies the following factors a trial court must consider:

> (i) The relative strength, nature, and stability of the child's relationship with each parent;
> (ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;
> (iii) Each parent's past and potential for future performance of parenting functions, . . . including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;
> (iv) The emotional needs and developmental level of the child;
> (v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;
> (vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and
> (vii) Each parent's employment schedule, and shall make accommodations consistent with those schedules.
> Factor (i) shall be given the greatest weight.

As long as the trial court properly considers these statutory factors, it has wide discretion in determining parenting responsibilities. In re Marriage of Possinger, 105 Wn. App. 326, 335, 19 P.3d 1109 (2001).

10

The parenting plan gives Caylor six professionally supervised visits with his daughter in Mill Creek followed by three visits at the home of Vaughan's father. Thereafter, the parenting plan permits visits at any location Caylor chooses. At first, the twice-weekly eight-hour visits take place on Wednesday and Saturday from 10:00 a.m. to 6:00 p.m. for a period of three months. If Caylor exercises this visitation without missing more than three visits, the parenting plan increases Caylor's residential time for three months to eight-hour visits on Wednesday and overnight visits each week from noon on Friday until 6:00 p.m. on Saturday. If Caylor exercises these visits without missing more than three visits, the parenting plan provides for continuation of eight-hour visits on Wednesday and overnight visits for two nights every other weekend from Friday at noon until Sunday at 6:00 p.m.

Vaughan contends the court abused its discretion by requiring the child to spend approximately 10 hours per week in transit to facilitate visitation with Caylor. Vaughan argues the visitation schedule is not in the best interests of the child. Vaughan claims that unless visits are for a two-night duration, Caylor should be required to exercise his visitation within five miles of her home in Redmond. Vaughan claims that because the trip from Redmond to Port Townsend includes a ferry ride and takes a total of 2 and ½ hours, the child will be required to spend 5 hours in transit during each 8-hour visit.

Vaughan's argument about the transportation time is not accurate. The parenting plan allows but does not require Caylor to exercise his eight-hour visits in Port Townsend. Vaughan also ignores the provision that after Caylor completes the supervised visits, his weekend residential time gradually increases to two consecutive nights.

Vaughan argues the court abused its discretion by prioritizing visitation with Caylor and finding Caylor "and the child are entitled to a relationship." Vaughan claims that although the default orders allowed supervised visitation, Caylor did not take advantage of that opportunity. While the court recognized Caylor could have made a greater effort to spend time with the child early on, the court expressly found the acrimony between the parties largely prevented Caylor from playing an active parenting role. Although Vaughan asserts otherwise, the record amply supports the finding that the parties' relationship, including Vaughan's unfounded allegations of domestic violence, created a barrier to Caylor spending time with the child.

Vaughan also challenges the summer school-age residential provisions. Vaughan argues an alternating weekly schedule is not in the child's best interest because it will preclude the child from participating in "regular summer activities like sports leagues, music, arts, theater, or other activities that require her attend throughout the summer." While recognizing the child is a toddler, Vaughan claims it is "likely" such activities will become important to the child in the future. Apart from speculation, nothing in the record establishes the summer school-age residential provision is not in the child's best interest.

Next, Vaughan contends RCW 26.09.184(6) requires the court to designate a specific time for a summer vacation with each parent in the residential provisions. Vaughan is incorrect. The statute requires a parenting plan to include a residential schedule that makes "provision" for holidays, birthdays, vacations, and other special occasions. RCW 26.09.184(6). The parenting plan provides adequate residential time with each parent to allow for vacations. The parenting plan also permits each parent to

adjust the residential schedule if the other parent agrees. Once the child enters kindergarten, the parents have alternating weekly residential time in the summer and each parent has time with the child during school breaks.

Finally, Vaughan contends the court abused its discretion in requiring some visitation exchanges to take place during the hours she works. Vaughan claims the court ignored the statutory directive to consider and accommodate her work schedule. See RCW 26.09.187(3)(a)(vii). But Vaughan did not present specific evidence about her work schedule, flexibility, or the policies of her workplace.[6] The record also shows that Vaughan's father said he would be willing to assist Vaughan in transporting the child for court-ordered visitation. Further, a parent's employment schedule is only one of the seven statutory factors the court is required to consider. See RCW 26.09.187(3)(a).

Evidentiary Ruling

Vaughan challenges the trial court's decision to exclude a letter written by a physician as hearsay. Vaughan sought to introduce an August 26, 2014 letter from a doctor. The letter states that Vaughan was "under significant amount of stress related to her relationship with her husband throughout the pregnancy" and that Vaughan reported "several times being afraid for her and her baby's safety given [Caylor's] reckless and irrational behavior." The letter also states that on January 25, 2013, Vaughan reported "severe domestic problems and a 'terrible fight'."

"The admission or refusal of evidence lies largely within the sound discretion of the trial court and will only be reversed upon a showing of abuse of that discretion."

---

[6] Only after the trial did Vaughan submit a declaration stating her work hours are 7:30 a.m. to 4:30 p.m. and inflexible.

Hume v. Am. Disposal Co., 124 Wn.2d 656, 666, 880 P.2d 988 (1994). Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Hearsay is not admissible unless allowed by court rule or statute. ER 802. Evidence rule 803(a)(4) is an exception to the hearsay rule.

> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

ER 803(a)(4). This exception allows doctors and other health care providers to testify about out-of-court statements made by patients related to medical treatment. See State v. Sandoval, 137 Wn. App. 532, 537, 154 P.3d 271 (2007).

Vaughan claims the letter was admissible under ER 803(a)(4) because it included statements made for the purpose of medical diagnosis or treatment. We disagree. Vaughan did not show the statements were for the purpose of diagnosis or treatment. In addition, because the letter is dated after the child was born, the letter does not appear to be a document created for the purpose of medical diagnosis and treatment. The trial court did not abuse its discretion in excluding the letter as hearsay.

Vaughan contends the court erred in failing to consider not only the letter from the doctor related to domestic violence, but also the recommendation of the social worker and the prior determination of a commissioner to issue a protection order.

Although the social worker recommended entry of a protection order, the record shows she expressed doubt about the truth of the allegations and recognized the suspicious timing and lack of corroboration.

The court found that in light of the evidence "developed more fully at trial," the allegations of domestic violence were not believable.

> The mother has given various versions of this incident but both parties state that the father was leaving the home in a vehicle when she stepped onto the side of the vehicle and reached her arm in and was reaching for the father's right arm. The mother says this was to get her phone and the father said she was trying to scratch at him and did punch him in the face. He said he was fearful of this PICC line which was in his right arm and, if the mother had been able to pull on it, would have harmed him considerably. The incident is regrettable but it is not an assault which cause[d] grievous bodily harm or the fear of such harm. The mother may have suffered a bruised arm, although she claimed elsewhere that the bruise came a different way. The mother did not call the police at that time and did not even call 911; she called her father and they went to coffee. This is not consistent with the requirements necessary to prove domestic violence. The mother's claim now that she was in fear of the father is not supported by the evidence. She did not request a restraining order or protection order when she filed for divorce one month later. She did not disclose this fear when questioned under oath only two weeks after the alleged incident. The mother contributed significantly to the event by following the father outside and getting on his vehicle and reaching into it.[7]

The court found Vaughan's "testimony was confusing, often inaccurate, and, at times, clearly exaggerated and/or false."

An appellate court may not substitute its evaluation of the evidence for that made by the trier of fact. Goodman v. Boeing Co., 75 Wn. App. 60, 82, 877 P.2d 703 (1994). We do not review the trial court's determinations as to the credibility and persuasiveness of the evidence. In re Marriage of Rich, 80 Wn. App. 252, 259, 907 P.2d 1234 (1996).

The record shows the trial court here considered and weighed all the evidence, including the social worker's recommendation. Faced with conflicting versions of the January 2013 incident, the trial court was entitled to reject Vaughan's account. With

---

[7] Internal quotation marks omitted, alteration in original.

respect to Vaughan's credibility, the trial court specifically observed in its oral ruling that it "believed almost nothing that Ms. Vaughan said in court." The court noted, "I don't think I have ever been faced with as many inconsistencies, exaggerations, disturbing admissions to probably crimes in court before in a family law case."

Attorney Fees Based on Intransigence

Vaughan argues the trial court abused its discretion in awarding attorney fees to Caylor based on her intransigence. We review attorney fee awards based on intransigence for an abuse of discretion—when the court's decision is outside the range of acceptable choices or based on untenable grounds or untenable reasons. In re Marriage of Bobbitt, 135 Wn. App. 8, 29-30, 144 P.3d 306 (2006); In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997).

In dissolution proceedings, a trial court may consider whether a party's intransigence caused additional legal fees and award attorney fees on that ground. In re Marriage of Crosetto, 82 Wn. App. 545, 563-64, 918 P.2d 954 (1996); In re Marriage of Greenlee, 65 Wn. App. 703, 708, 829 P.2d 1120 (1992). "Intransigence is the quality or state of being uncompromising." In re Marriage of Schumacher, 100 Wn. App. 208, 216, 997 P.2d 399 (2000). Determining intransigence is necessarily factual but may involve delay, obstruction, filing unnecessary or frivolous motions, refusing to cooperate with the opposing party, noncompliance with discovery requests, and any other conduct that makes the proceeding unduly difficult or costly. Greenlee, 65 Wn. App. at 708.

The trial court entered numerous findings of intransigence that support the award of attorney fees. For example, the court found:

> The wife's position in this case was not supported by the evidence.
> She could not explain her own claims, particularly with regard to medical

16

expenses, in a coherent manner. Her testimony, at times, was contrary to the plain language of the documents that she claimed supported her request for reimbursement of medical expenses.

. . . .

The wife's testimony as to her daycare providers was troubling. She has consistently claimed that she paid $2,000 per month in cash for daycare since [the child]'s birth in 2013. Here again, she did not disclose that this amount was false until she was cross-examined by counsel. . . .

. . . .

The wife failed to timely appear for her own deposition.

The wife provided faulty contact information for many of her planned witnesses.

The wife did not timely and fully answer interrogatories even after being ordered to do so.

. . . .

The wife provided information to the court and Family Court Services that was exaggerated, incomplete, deceptive and, at times, outright false. Many more hours of trial preparation and trial were necessitated by her statements.

The wife and her counsel have maintained positions in this trial that were not supported by the evidence. The court finds that the wife has engaged in a pattern of serious intransigence that required the father to incur significant additional legal fees and costs.

Vaughan argues the $30,000 attorney fee award is out of proportion to the limited financial issues before the court and short duration of the marriage. Vaughan also argues the court abused its discretion by rewarding Caylor for expending unnecessary funds to litigate "irrelevant financial details." The record does not support her arguments.

The record supports the trial court finding that Vaughan's "serious intransigence" increased the costs of litigation. In addition to child support, Vaughan sought

17

reimbursement for medical expenses, postseparation housing costs, and day care expenses. The court pointed to numerous instances of specific conduct including failing to appear for her deposition, failing to provide accurate information about witnesses, refusing to produce evidence, and producing false evidence or evidence that did not support her claims.

The court's determination of intransigence during the litigation supports the award of attorney fees.

Attorney Fees on Appeal

Caylor asserts the appeal is frivolous and requests an award of attorney fees on appeal. Because RAP 18.1(b) requires a party requesting attorney fees to devote a section of its opening brief to the request for fees or expenses, we deny his request for appellate attorney fees.

We vacate the provision in the parenting plan and the order of child support restricting protected speech and remand to craft specific provisions prohibiting only unprotected speech. In all other respects, we affirm the decree of dissolution, final parenting plan, finding of facts and conclusions of law, and order of child support.[8]

WE CONCUR:

Trickey, ACJ

Becker, J.

---

[8] We reject Vaughan's request to remand the case to a different judge.