

2015 JUL 27  11: 07

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Parenting and Support of O.E.D, | ) ) ) | No. 71899-1-I |
| | ) | DIVISION ONE |
| A Minor Child, | ) ) | |
| EVELINA BARHUDARIAN, | ) ) | |
| Appellant, | ) ) | UNPUBLISHED OPINION |
| v. | ) ) | |
| ANDREW BERNARD DANHOF, | ) ) | |
| Respondent. | ) | FILED: July 27, 2015 |

SCHINDLER, J. — In this parentage action, Evelina Barhudarian appeals entry of

the final parenting plan and order of child support. Barhudarian contends the court did

not engage in an analysis of the statutory factors under RCW 26.09.187(3) and

improperly relied on the "friendly parent concept"[1] in adopting the final parenting plan.

Barhudarian also contends the court abused its discretion in admitting a recording of a

threat she made and a letter from a therapist. Because neither the written findings nor

the oral ruling reflect consideration or application of the statutory factors, we remand.

On remand, the court shall address only the statutory factors in adopting a parenting

---

[1] In re Marriage of Lawrence, 105 Wn. App. 683, 687, 20 P.3d 972 (2001).

plan and entering findings of fact and conclusions of law and shall not take into consideration its own philosophy or the friendly parent concept.

## FACTS

Andrew Bernard Danhof served in the United States Army for seven and a half years. Danhof returned from his final tour in Iraq in September 2009.

In October, Danhof began dating Evelina Barhudarian. In December, Barhudarian and her two-and-a-half-year-old child, A.G., started living with Danhof.

In the spring of 2010, Barhudarian was pregnant. Danhof left active military duty and started working as a senior service technician at a commercial machinery company. On January 31, 2011, Barhudarian gave birth to O.E.D. Barhudarian stayed home to take care of O.E.D. and A.G.

In October 2011, Danhof and Barhudarian separated. Barhudarian lived with her parents in Renton. Danhof lived with his parents in Bothell. Barhudarian and Danhof agreed to a shared residential schedule for O.E.D. For the next 18 months, O.E.D. lived with each parent every other week.

In September 2012, the State of Washington Department of Social and Health Services sent Danhof a letter stating it "will not be investigating" a recent report of "abuse or neglect of a child." The letter states that "Child Protective Services (CPS) received a report" in July about "[p]roblems concerning child's visits with you - including medical concerns of rash of unknown etiology. Also allegedly child returns home hungry and thirsty - however there was no allegation of neglect concerning this."

On April 14, 2013, Danhof took O.E.D. to the emergency room of Seattle Children's Hospital. Danhof repeatedly tried to contact Barhudarian because he did not have access to the child's insurance or medical records. According to Danhof, because

he could not reach Barhudarian, he could not obtain medical care and had to take O.E.D. home. That evening, Barhudarian called Danhof and demanded he return the child because O.E.D. had an appointment to see a gastrointestinal specialist the next morning. Barhudarian was "very upset" and repeatedly told Danhof she was going to have him murdered. According to Danhof,

> [Barhudarian] stated repeatedly that she was going to have me murdered. She was very irate, yelling at me a lot, and — at which point in time, you know, I — I told her then, because she was acting so aggressive and whatnot, I did not want to have that around [O.E.D.] You know, give her time to cool down and whatnot. And I told her I was — "Evelina, if you come here, I'm calling the police." Because I — I did not want that — I did not want any of that with her severe hostility. I heard a male voice in the background.

Danhof called 911. Barhudarian also called 911 to request a welfare check on O.E.D. Barhudarian reported Danhof was intoxicated and "heavily armed."

A Bothell Police Department officer responded. The officer found O.E.D. "to be well cared for" and O.E.D. "was clean and . . . appeared to be happy. . . . At no time during the investigation did [the officer] suspect [Danhof] had been drinking or consuming any illegal narcotics." The officer's report states, in pertinent part:

> [O.E.D.] has been sick for several days. [Danhof] attempted to contact [Barhudarian] to let her know, as she has insurance for [O.E.D.] and he does not; but she never responded. [Danhof] told me that [Barhudarian] does not share [O.E.D.]'s medical information with him in respect to appointments, etc. Since [Danhof] could not get in touch with [Barhudarian] he took [O.E.D.] to the Children's Hospital Urgent Care Center on 04/1[4]/13. [Danhof] told me that [Barhudarian] made four phone calls to his cell phone today. The first call was at 1832 hours, during this call [Barhudarian] began yelling at [Danhof] for not being at the meet. [Danhof] hung up the phone because [Barhudarian] was yelling at him and not letting him speak. The second call came in at 1834 hours. [Danhof] answered the phone and [Barhudarian] began yelling at him again. During this call, [Barhudarian] threatened [Danhof] at least twice by saying, I am going to "murder you." [Danhof] hung up the telephone. At 1835 hours, [Danhof] answered the phone and spoke with [Barhudarian] briefly before hanging up because he could not get her to calm down. At

1838 hours, [Danhof] answered the phone and spoke with [Barhudarian]. [Barhudarian] told [Danhof] that he was going to be murdered. [Danhof] responded by telling [Barhudarian] not to come to his house or he would call 911.

The officer took a statement from Danhof about trying to obtain medical information from Barhudarian and the threats she made to him. The officer spoke to Barhudarian by phone. Barhudarian denied "threatening to murder" Danhof. Barhudarian told the officer Danhof had "threatened her." The report states both parties alleged domestic violence against each other in the past. The officer told Danhof and Barhudarian to obtain a parenting plan and gave them information about how to file for a protection order. The report states, in pertinent part:

> Both parties alleged that they were assaulted in the past by the other. No information provided to me during the investigation suggested that there was a recent assault.

> Both parties were advised to obtain a parenting plan. Both parties were advised where to go to petition for a court order. Neither party had any supporting evidence to substantiate their complaint.

The next morning, Danhof, his stepmother, and O.E.D. met Barhudarian, Barhudarian's mother, and Barhudarian's ex-boyfriend "Danny" at the doctor's office. According to Danhof, after the doctor's appointment, Barhudarian "forcibly took" O.E.D. from him.

That afternoon, Danhof filed a "Petition for Order for Protection" in King County District Court. In the petition, Danhof alleges, in pertinent part:

> During our time living together from Nov[ember] 2010 to Oct[ober] 2011, [Barhudarian] physically assaulted me multiple times. She has often bragged about her ties to violent criminals. On December 9th 2012 she said "I'm going to put a bullet in your head." I have a whitness [sic] for that event. On April 14th 2013 she said "I'm going to murder you" multiple times and "I'm going to have you murdered."

. . . .

4

Today, April 15, 2013, [Barhudarian] came to [O.E.D.]'s doctor appointment and forcibly took [O.E.D.] from my possession. As there is no current court orders I was unable to do anything. She was with . . . a convicted felon that has been physically abusive to her in the past and I am greatly concerned with [O.E.D.]'s safety in that environment.

The court entered a temporary domestic violence protection order preventing Barhudarian from "harassing, threatening, or stalking" Danhof but allowing supervised "exchange of the child."

On April 19, Barhudarian filed a petition for a protection order and a petition for a parenting plan and order of child support. The proposed parenting plan designates Barhudarian as the primary residential parent. Barhudarian requested imposition of restrictions on Danhof's residential time based on a "history of acts of domestic violence" and a finding that his "involvement or conduct may have an adverse effect on the child's best interests." Barhudarian requested supervised visitation and imposition of conditions requiring Danhof to obtain a psychological evaluation, a domestic violence assessment, and a substance abuse evaluation and prohibiting him from carrying a firearm. That same day, the court entered a temporary domestic violence protection order restraining Danhof from being within 500 feet of Barhudarian's house.

On May 6, Danhof responded to the petition and submitted a proposed parenting plan designating him as the primary residential parent with sole decision-making authority. His proposed parenting plan allows Barhudarian to have residential time with O.E.D. every other weekend and each Wednesday evening. Danhof requested the court impose restrictions on Barhudarian's residential time with O.E.D. based on a "history of acts of domestic violence" under RCW 26.09.191. Danhof also requested entry of a finding that Barhudarian's "involvement or conduct may have an adverse

effect on the child's best interests." Danhof alleged a long-term emotional or physical impairment that interferes with the performance of parenting functions and the abusive use of conflict that creates the danger of serious damage to the child's psychological development. Danhof also asked the court to impose conditions prohibiting Barhudarian from making "derogatory remarks about the father" to the child or in the presence of the child and prohibiting either parent from denying "access to the child's medical records."

On May 10, the court entered a mutual restraining order prohibiting "[b]oth parties" from "disturbing the peace of the other party or of any child." The court also entered a temporary parenting plan designating Barhudarian as the primary residential parent. The temporary parenting plan gave Danhof visitation on "alternating weekends from 5:00 p.m. on Friday to 5:00 p.m. on Sunday" plus "one overnight visit on the alternating week on Wednesday at 5:00 p.m." The court entered a temporary order of child support requiring Danhof to pay Barhudarian $564.82 per month. The court also entered an order appointing a guardian ad litem (GAL) to represent the best interests of O.E.D.

On January 10, 2014, the GAL filed a report. The GAL recommended the court designate Barhudarian as the primary residential parent but allow Danhof visitation on the first, second, fourth, and fifth weekend of each month. The report states the recommended schedule for O.E.D. is "based upon the parent's schedules and [the child's] young age." The GAL states that because Danhof works during the week, "it appears the best way to maximize [O.E.D.]'s time with both parents is for [the child] to have residential time with [the] mother during the week and residential time with [the] father on the weekends."

6

According to the GAL, the "biggest concern" is the "very poor and somewhat hostile communication between the parties." Both parents "allege the other to have been violent, physically and emotionally and it seems the relationship was highly conflictual and volatile." The GAL recommended imposing no restrictions under RCW 26.09.191 "though abusive use of conflict was considered."

The report states O.E.D. has "attachments to both parents that were observed during both sets of home visits." The report states that "both parents were patient, soft spoken, encouraging, smiling and pleasant," and O.E.D. "was physically affectionate, responsive, expressive and pleasant" to both parents.

However, the GAL notes that a significant concern from "the collateral information and review of text messages" is "the mother's anger and bad-mouthing of the father." The report states, "Given that [O.E.D.] has witnessed name calling, yelling, conflict and more between or by one of [the child's] parents, [O.E.D.] could have feelings of confusion, hurt, anger or sadness in the future."

> A noteworthy concern is what [O.E.D.]'s doctor's office reported to this GAL about the mother speaking negatively about the father in [O.E.D.]'s presence on multiple occasions. [O.E.D.] is old enough now to pick up on this. . . . Negative comments about another parent in front of the child can greatly upset that child, as the child likely loves both parents and has relationships with both parents, like [O.E.D.] does. Negative comments can be internalized by a child and can also lead to the child feeling resentment at the parent making the comments.

The GAL also states the pediatrician reported Barhudarian "has a 'litany of negative things' against the father" and "can be 'extreme' in thinking the father is a horrible person and responsible for any of [O.E.D.]'s illnesses." The pediatrician told the GAL O.E.D. has heard Barhudarian speak negatively about Danhof "a million times."

7

The GAL recommended both Danhof and Barhudarian participate in individual therapy and the court make clear that both parents have "full access" to O.E.D.'s medical records. The GAL recommended a number of other conditions to encourage the parents to be "flexible and adaptable" and refrain from making negative comments or otherwise inappropriately involving the child in disputes.[2]

Before trial, Barhudarian submitted a revised parenting plan that incorporated most of the conditions recommended by the GAL, including the need to be flexible and cooperatively work together.

Fourteen witnesses testified during the three-day trial including Barhudarian, her mother, her sister, Army Reservist Frank Rorie, Danhof, his stepmother, and his

---

[2] For example, the GAL recommended the court impose the following conditions:

12. It is expected that the parenting plan residential provisions will be flexible and adaptable in accordance with the child's changing needs. As the child increases in age and maturity the child's needs and desires will become increasingly important and will be considered by both parents in scheduling residential time.

. . . .

23. Each parent shall exert every reasonable effort to maintain free access and unhampered contact and communication between the child and the other parent, and promote the emotions of affection, love and respect between the child and the other parent. Each parent agrees to refrain from words or conduct, and further agrees to discourage other persons from uttering words or engaging in conduct, which would have a tendency to estrange the child from the other parent, to damage the opinion of the child as to the other parent, or to impair the natural development of the child's love and respect for the other parent.

24. Each parent shall honor the other parent's parenting style, privacy and authority. Neither parent shall interfere in the parenting style of the other nor shall either parent make plans or arrangements that would impinge upon the other parent's authority or time with the child, without the express agreement of the other parent. Each parent shall encourage the child to discuss his or her grievance against a parent directly with the parent in question. It is the intent of both parents to encourage a direct parent-child bond and communication.

25. Neither parent shall advise the children of any child support or other legal matters.

26. Neither parent shall use the child, directly or indirectly, to gather information about the other parent or take verbal messages to the other parent.

. . . .

28. The parents may revise the parenting plan by mutual consent in writing at any time.

. . . .

31. The parents understand that this residential schedule represents a minimum amount of time that the child will reside with the parents and that the child may reside with them at any other agreed to times.

girlfriend. Danhof represented himself pro se. The court admitted into evidence a number of exhibits including text messages, medical records, and photographs.

Barhudarian testified Danhof was controlling and there were "lots of incidences of aggression" and assault. Barhudarian testified Danhof hit her with a closed fist and submitted photographs showing a bruise on her face. Barhudarian testified that after they separated, "the conflict did not stop." According to Barhudarian, Danhof would call her repeatedly "just to yell at me."

Barhudarian testified she blocked Danhof's access to O.E.D.'s medical records "[a]fter obtaining the restraining order, in accordance with the hospital regulation and policy." When asked "why it would be in [O.E.D.]'s best interest to deny [Danhof] medical access," Barhudarian answered, "The intention was not to deny specifically medical access; however, I had [a] basis to get a restraining order which was granted by the Court."

According to Barhudarian, Danhof refused to comply with O.E.D.'s "very strict diet" and the child often had health problems after visiting with him including rashes, bruises, and scratches. Barhudarian described one occasion when O.E.D. "was in such poor condition — clothing soiled, smelled unpleasant — that the hospital staff had requested a social service worker." Barhudarian testified that "the social services worker had then forwarded this information to CPS." When the court asked whether she told "anyone at the hospital that there was abuse or neglect committed by Mr. Danhof," Barhudarian answered, "I don't remember saying that." Upon further questioning about whether she made the CPS referral, Barhudarian testified, "I wasn't aware at the time when I spoke to the social worker that it would be forwarded to CPS."

9

Barhudarian testified her ex-husband never physically abused her and there was no "history or allegations of domestic violence" with him. Barhudarian said she was very close to her ex-husband and her relationship with him was "very good." During questioning by the court, Barhudarian said she did not remember whether her ex-husband abused her, but said she never sought a protection order against him.[3] However, the next morning, Barhudarian said she recalled reporting "two prior incidences" of domestic violence by her ex-husband.

Frank Rorie testified that he and Danhof served "two tours [in] Iraq together." After returning from their final tour, Danhof lived with Rorie until he moved out to live with Barhudarian and A.G. Rorie testified that one time when he was visiting the couple at their apartment, he witnessed Barhudarian "smacking" Danhof in "the face, the chest, [and] the arms." Rorie said Danhof was "kind of like offering himself as a cathartic punching bag, if you will, so she could kind of work out the issues that she was going through." Rorie testified that after the couple separated, he was in the car with Danhof

---

[3] Q.   Okay. And is it your testimony that [A.G.'s father] was never abusive to you? Physically or emotionally?
A.   We've had altercations but —
Q.   Physical altercations?
A.   Sorry. It's hard to remember. Not that I can remember any at — at this point. I — I'm sorry.
Q.   So you don't remember whether or not you had any physical altercations with [A.G.]'s dad?
A.   That's correct.
Q.   Were the police ever called to any domestic conflict between you and [A.G.], whether he called or you called?
A.   Between me and [A.G.]?
Q.   Yeah.
A.   My — my child?
Q.   I'm so sorry. [A.G.]'s father.
A.   No.
Q.   No? Okay. And did you ever obtain any kind of a protection order or restraining order or domestic violence order against [A.G.]'s father?
A.   No.

while Danhof and Barhudarian were arguing on the speakerphone. Rorie testified that Barhudarian told Danhof, "I will put a bullet in your head."

Danhof testified and denied the allegations of domestic violence. Danhof said Barhudarian first threatened to kill him in December 2012. Danhof introduced a recording of the exchange on March 28, 2013 when he met Barhudarian to pick up O.E.D. for the week. After discussing dietary restrictions for the child, Barhudarian warned Danhof not to bring O.E.D. back "sicker." Barhudarian then threatened to tie Danhof "to a pole outside" and feed him fish, to which he has an allergy.

Danhof testified that after receiving the GAL report, he engaged in counseling. Danhof submitted evidence showing he did not suffer from PTSD.[4]

At the conclusion of the trial, the court issued a written memorandum opinion. The "Findings of Fact and Conclusions of Law on Petition for Parenting Plan and Order of Child Support" incorporate the "Memorandum of Opinion."

The court found that after receiving the GAL report, Danhof "immediately began to comply with the recommendation" to participate in counseling while Barhudarian "has yet to attend a single session." The court found the record established no evidence supported finding Danhof suffered from PTSD.

The court "did not find credible" Barhudarian's testimony of domestic violence. The Memorandum of Opinion states, in pertinent part:

> Most determinative to the court's opinion on this issue was the mother's contradictory testimony regarding the presence of domestic violence in her prior marriage. Other witnesses testified that the mother alleged that she was abused by her prior husband. When directly questioned regarding this, mother testified "it's hard to remember whether there was [domestic violence]." The next day at trial, she testified that she now recalled two past instances of domestic violence involving her prior husband. The

---

[4] Post-traumatic stress disorder.

court did not find it credible that the mother (or anyone) would "forget" being the victim of domestic violence. Such testimony demonstrates that the mother was willing to either fabricate domestic violence or that her memory is such that it cannot be trusted on this point.

Because the court found no credible evidence of domestic violence, the court did not impose parenting plan restrictions under RCW 26.09.191. However, the court found the text messages from Barhudarian were "troubling." The court found the text messages Barhudarian sent Danhof demonstrated "open hostility, name calling and extreme profanity." The court found Rorie's testimony that in December 2012, Barhudarian told Danhof, "I will put a bullet in your head" credible.[5] The court also notes that on March 28, 2013, Barhudarian threatened to tie Danhof to a pole and feed him fish "(to which he is allergic)," and that on April 14, 2013, she told him, "I am going to murder you."

The court also expressed concern about the pediatrician's report that "the mother berates the father incessantly in front of [O.E.D.]" and "report[s] concerns of abuse and/or neglect by the father," but notes the pediatrician "has never seen any abuse or neglect by either parent." The court found Barhudarian's refusal to provide medical information to Danhof created a risk of harm to the child. The Memorandum of Opinion states, in pertinent part:

> [T]ext messages between the parties showed the father repeatedly trying to be involved in the child's health and well-being (including efforts to go to doctor appointments and exchange medical information regarding [O.E.D.]) and the [mother] refusing such requests. Again, the texts were laced with name calling, profanity and hostility. The court was troubled by the petitioner's action in blocking the respondent from having access to any of [O.E.D.]'s medical records and/or history. Petitioner also advised respondent that he was prohibited from using the insurance that she

---

[5] Barhudarian contends substantial evidence does not support the court's finding that Rorie's testimony was credible. Because this court defers to the trier of fact's credibility determinations, we do not address this argument. In re Marriage of Meredith, 148 Wn. App. 887, 891 n.1, 201 P.3d 1056 (2009).]

provided for [O.E.D.] Such behavior with regard to the child's health is inexcusable and could potentially put the child's health at risk were [O.E.D.] to experience a medical emergency while with the father.

The memorandum opinion also addressed the CPS referral.

The mother testified that in September 2012, she took [O.E.D.] to the emergency room because of a bruise on [the child's] arm. She testified that a nurse had initiated a CPS referral of the father for that injury. In reality, it was the mother who initiated the referral which was later determined to be "unfounded."

The final parenting plan establishes a shared residential schedule until O.E.D. begins school. After O.E.D. starts kindergarten, the parenting plan designates Danhof as the primary residential parent and allows residential time with Barhudarian on Wednesday and every other weekend. The parenting plan gives sole decision-making authority to Danhof for education and nonemergency health care. The final parenting plan includes conditions recommended by the GAL and requested by Barhudarian including "[i]t is expected that the parenting plan residential provisions will be flexible and adaptable."

In the motion for reconsideration, Barhudarian asked the court to defer entry of a final parenting plan until O.E.D. is enrolled in school. Barhudarian also asked the court to allow her "the right of first refusal to provide daycare" if Danhof is unavailable. The court denied the motion for reconsideration.

ANALYSIS

Parenting Plan

Barhudarian contends the court erred in ordering a shared residential schedule, designating Danhof as the primary residential parent when O.E.D. begins school, and giving Danhof sole decision-making authority for education and nonemergency health care. Barhudarian asserts the court did not consider or address the best interests of the

13

child or the statutory factors listed in RCW 26.09.187(3) but instead improperly relied on the friendly parent concept.[6]

Under the Uniform Parentage Act of 2002, chapter 26.26 RCW, after paternity has been acknowledged, the parties may commence a judicial proceeding for a parenting plan on the same basis as provided in chapter 26.09 RCW. RCW 26.26.375(1)(a).

We review the trial court's parenting plan decision for abuse of discretion. In re Marriage of Littlefield, 133 Wn.2d 39, 46, 940 P.2d 1362 (1997). The court abuses its discretion only if the decision is manifestly unreasonable or based on untenable grounds or untenable reasons. Littlefield, 133 Wn.2d at 46-47.

A trial court has broad discretion in adopting and ordering a parenting plan. Littlefield, 133 Wn.2d at 51-52. This court does not review the trial court's credibility determinations, nor can it weigh conflicting evidence. In re Marriage of Rich, 80 Wn. App. 252, 259, 907 P.2d 1234 (1996).

An appellate court will not retry the facts on appeal and will accept findings of fact as verities if they are supported by substantial evidence in the record. In re Marriage of Thomas, 63 Wn. App. 658, 660, 821 P.2d 1227 (1991). Because of the trial court's unique opportunity to observe the parties, we are " 'extremely reluctant to disturb child placement dispositions.' " In re Parentage of Schroeder, 106 Wn. App. 343, 349, 22

---

[6] Barhudarian also asserts substantial evidence does not support the court's finding that her "behavior with regard to the child's health is inexcusable and could potentially put the child's health at risk were [O.E.D.] to experience a medical emergency with the father." We disagree. Danhof testified that in April 2013, he was unable to obtain treatment for O.E.D. at Seattle Children's Hospital because of his lack of access to the child's medical information. Danhof's stepmother testified she worries that "if [Danhof] was somewhere with [O.E.D.], and God forbid something happened, he didn't even know if [O.E.D.] was allergic to anything."

P.3d 1280 (2001) (quoting In re Marriage of Schneider, 82 Wn. App. 471, 476, 918 P.2d 543 (1996)).

When making decisions regarding residential placement, the trial court must analyze the factors in RCW 26.09.187(3). Littlefield, 133 Wn.2d at 52. The Parenting Act of 1987, chapter 26.09 RCW, requires the court to consider the best interests of the child at the time of trial "after considering the factors set forth in RCW 26.09.187(3)(a)." Littlefield, 133 Wn.2d at 52. RCW 26.09.187(3)(a) sets forth the following factors:

> Where the limitations of RCW 26.09.191 are not dispositive of the child's residential schedule, the court shall consider the following factors:
> (i)   The relative strength, nature, and stability of the child's relationship with each parent;
> (ii)  The agreements of the parties, provided they were entered into knowingly and voluntarily;
> (iii) Each parent's past and potential for future performance of parenting functions, as defined in . . . RCW 26.09.004[(2)],[7] including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;
> (iv)  The emotional needs and developmental level of the child;
> (v)   The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;
> (vi)  The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and
> (vii) Each parent's employment schedule, and shall make accommodations consistent with those schedules.
> Factor (i) shall be given the greatest weight.

---

[7] RCW 26.09.004(2) states, in pertinent part:
"Parenting functions" means those aspects of the parent-child relationship in which the parent makes decisions and performs functions necessary for the care and growth of the child. Parenting functions include:
(a) Maintaining a loving, stable, consistent, and nurturing relationship with the child;
(b) Attending to the daily needs of the child, such as feeding, clothing, physical care and grooming, supervision, health care, and day care . . . ;
. . . .
(d) Assisting the child in developing and maintaining appropriate interpersonal relationships;
(e) Exercising appropriate judgment regarding the child's welfare, consistent with the child's developmental level and the family's social and economic circumstances.

Because the written findings do not "clearly reflect a consideration of the statutory factors," we look to the oral ruling. In re Marriage of Murray, 28 Wn. App. 187, 189, 622 P.2d 1288 (1981). Barhudarian argues the oral ruling shows the court improperly relied on the "friendly parent concept."

Under the friendly parent concept, primary residential placement is awarded to the parent most likely to foster the child's relationship with the other parent. In re Marriage of Lawrence, 105 Wn. App. 683, 687, 20 P.3d 972 (2001). A trial court's use of the friendly parent concept is an abuse of discretion. Lawrence, 105 Wn. App. at 688. The legislature has repeatedly rejected the friendly parent concept, and our courts disfavor its use because residential placement should not be used to penalize or reward parents for their conduct. Lawrence, 105 Wn. App. at 687-88. The court cannot use residential placement and visitation "to penalize or reward parents for their conduct." In re Marriage of Cabalquinto, 100 Wn.2d 325, 329, 669 P.2d 886 (1983).

In the oral ruling, the trial court addressed the need to make a decision in the best interests of the child before turning to the allegations of domestic violence and whether to impose restrictions under RCW 26.09.191. The court found Barhudarian's "testimony with regard to domestic violence to be not credible, and . . . there was no evidence of any violence perpetrated against [Barhudarian]." The court concluded, "[T]here will be no [RCW 26.09.]191 . . . restrictions in this case."

The court then addressed the "substantial evidence" of Barhudarian's "threatening and aggressive behavior and, frankly, openly hostile behavior" toward

Danhof. In particular, the court expressed concern about the threats to harm him and the refusal to allow Danhof to have access to the child's medical information.

> The Court was very troubled by the petitioner's actions in blocking the father's access to [O.E.D.]'s medical records. There's simply — on the facts of this case and the evidence in this case can be — the Court cannot conceive of any valid reason for any parent to block another parent's access to medical information. Not only is it unnecessary and punitive, it was potentially dangerous given that [O.E.D.] was partly at this time in [the] father's care, and if he were to have to take [the child] for emergency care he would not have access to medical information or the medical history that he might need.

The court also expressed concern about negative comments Barhudarian made about Danhof in front of the child.

> Perhaps most troubling was [the pediatrician]'s statements that he — that [Barhudarian]'s extremely anxious and has reported the father is evil and should not be involved. . . . He reports that [O.E.D.] has heard the mother say this, quotation marks, a million times. The Court doesn't need to tell the parties how damaging it is for children to hear those kinds of things from one parent about another.

The court then discussed its philosophy about parenting plans.

> I want to talk philosophically for a moment about parenting plans and my belief that parenting plans are designed to be in the ideal setting very flexible, and nothing will — should deter the parties from, frankly, going around the parenting plan and providing flexibility to one another, compassion to one another, and frankly, more access to one another if it works out that way. . . . I always hope that parents will work together to not, you know, abide by the parenting plan every dotted I or crossed T, but rather work together to — in the best interests of their child, and that's what this court wants.

The court concluded by stating, "With that in mind, . . . given what I have already discussed regarding the mother's hostility and uncooperative nature toward Mr. Danhof," the court would adopt Danhof's proposed parenting plan.

> [I]t's clear to this court that the only party that is going to be flexible, at least at this point, and perhaps provide more contact between the parent and child is Mr. Danhof, and it is for that reason that the Court is adopting,

17

not a hundred percent, but in — substantially is adopting Mr. Danhof's parenting plan.

Because we are unable to determine the basis for the court's ruling, we remand to address the statutory factors and enter findings of fact and conclusions of law. Although the court considered the best interests of the child, the court did not engage in an analysis of the statutory factors under RCW 26.09.187(3) in either the written findings or the oral ruling. If the written findings and the oral ruling do not reflect any application of the statutory elements, we must remand for entry of findings based on the statutory factors. On remand, the court shall not consider either the court's own philosophy or the friendly parent concept.

Evidentiary Rulings

Barhudarian also challenges the trial court's decision to admit a recording and a letter of a therapist. Because we remand, we address the evidentiary rulings.

Barhudarian contends the court erred in admitting the March 28, 2013 recording, Exhibit 125. Barhudarian argues the recording violates the Privacy Act, chapter 9.73 RCW.

As a general rule, evidence obtained in violation of the Privacy Act is "inadmissible in any civil or criminal case." RCW 9.73.050. The Privacy Act "prohibits anyone not operating under a court order from intercepting or recording certain communications without the consent of all parties." State v. Roden, 179 Wn.2d 893, 898, 321 P.3d 1183 (2014).

However, if the conversation "convey[s] threats of extortion, blackmail, bodily harm, or other unlawful requests or demands," it may be legally recorded with the "consent of one party." RCW 9.73.030(2)(b). The term "convey" is broadly defined as

18

" 'to impart or communicate either directly by clear statement or indirectly by suggestion, implication, gesture, attitude, behavior, or appearance.' " State v. Caliguri, 99 Wn.2d 501, 507-08, 664 P.2d 466 (1983) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 499 (1971)).

Exhibit 125 states, in pertinent part:

[I]f [O.E.D.] comes back sicker . . . . If anything happens to [the child], I'm tying you up to a pole outside and feeding you fish. I'm not joking, so I would not be laughing. . . . Okay, well if you don't think I'm doing it, you're dead wrong. . . . Dead wrong.

The court ruled Barhudarian threatened Danhof in the March 28, 2013 recording.

The . . . recording of March 28th, 2013, wherein the petitioner threatened to tie Mr. Danhof up and feed him fish, to which he is allergic. Interesting about that recording is Mr. Danhof laughs, at which point the mother said, "This is nothing to laugh about. This is serious and I'm serious."

The court did not err in admitting Exhibit 125 under the threat exception to the Privacy Act. RCW 9.73.030(2)(b).

Barhudarian contends the court abused its discretion in admitting a letter dated February 21, 2014 from the couple's joint therapist, Exhibit 114.[8] Barhudarian objected to the admission of Exhibit 114 as hearsay.[9] In overruling the objection, the court ruled, "It's a letter from a therapist that was referenced in both the petitioner's case and the respondent's case and as such it's admissible as an exception to the hearsay rule." The record does not support the court's finding that Barhudarian referenced the letter

---

[8] The letter states, in pertinent part:

To whom it may concern,

On 9/13/12 Andrew Danhof and Evelina Barhudarian came to my office for counseling. Their goals were to have a healthy strong family and relationship. They returned for two more sessions and then stopped coming. There was no mention of abuse or violence during these sessions.

[9] Barhudarian also contends the letter was not authenticated as required by ER 901. But the joint statement of evidence clearly states Barhudarian admitted to the authenticity of the letter but objected to admission.

during her case, and it is not clear what exception to the hearsay rule applies. Contrary to Danhof's argument on appeal, the letter is not admissible as a statement made for the purpose of medical diagnosis or treatment under ER 803(a)(4), or as impeachment under ER 613. We conclude the court abused its discretion in admitting the letter from the therapist as an exception to the hearsay rule.

We remand for further proceedings consistent with this opinion.[10]

Schindler, J.

WE CONCUR:

Leach, J.                                    Cox, J.

---

[10] We decline to award either Barhudarian or Danhof attorney fees on appeal.