COURT OF APPEALS DIV 1
2017 DEC 18  AM 9: 52


IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Parentage of JACOB CUHACIYAN-RIGGINS, | ) ) ) | No. 75353-3-I (Consolidated with No. 75650-8-I) |
| Child(ren). | ) ) | |
| CHRISTINE CUHACIYAN, | ) ) | |
| Appellant, | ) ) | UNPUBLISHED OPINION |
| and | ) ) | |
| RYAN RIGGINS, | ) ) ) | |
| Respondent. | ) | FILED: December 18, 2017 |

SCHINDLER, J. — Christine Cuhaciyan challenges the order modifying the parenting plan and the order of child support. We remand to include a restriction under RCW 26.09.191 to ensure the mother's boyfriend does not have unsupervised contact with the child. We remand the amended child support order to allocate payment for extraordinary expenses and to designate a residential custodial parent for purposes of state and federal statutes. In all other respects, we affirm.

2013 Parenting Plan

Christine Cuhaciyan and Ryan Riggins met in 2001 while attending Bellevue

Community College.[1] They started dating six months later. When Cuhaciyan was admitted to Arizona State University, Riggins agreed to move to Arizona. While in Arizona, Riggins attended school to obtain an electrician certificate and worked as an electrician. After Cuhaciyan graduated with a degree in psychology in 2010, she decided to return to Washington.

After moving back to Washington, Cuhaciyan and Riggins agreed to break up. Six months later, the couple decided to resume their relationship and have a child together.

Two weeks before the baby was born, Riggins bought a house in Shoreline. Their son Jacob was born on April 15, 2012. On May 2, Riggins filed an acknowledgement of paternity.

After the birth of their son, Cuhaciyan suffered from postpartum depression and was "anxious and stressed out." While at the mall, Cuhaciyan accidentally locked the four-week-old baby in the car. Cuhaciyan called Riggins. Riggins "got really angry," "yelled" at her, and said she was a "horrible mother." Riggins told Cuhaciyan to call the police or security. When Cuhaciyan returned home, Riggins apologized, but Cuhaciyan was still "pretty upset." While Riggins was at work the next day, Cuhaciyan left with the baby and moved in with her parents.

Riggins retained a lawyer to establish a parenting plan. On August 13, Cuhaciyan filed an amended petition for a parenting plan and child support. The court appointed a court-appointed special advocate (CASA) to make recommendations about the parenting plan.

---

[1] Now known as Bellevue College.

2

The CASA filed a report on April 29, 2013. The report states that "the primary issue" is "the parents are not able to communicate because the mother is not comfortable dealing with the father." The report states the CASA is " 'not concerned that Ryan poses a direct safety threat to Christine.' " " 'The best thing for Jacob is to have both parents communicating and cooperating.' " The CASA concluded there was no evidence that Riggins' use of "medical marijuana would impair the father's ability to parent." The CASA recommended Cuhaciyan attend counseling and follow treatment recommendations. The CASA recommended Riggins obtain a mental health and domestic violence evaluation.

Ryan Patterson, MA, LMHC, PLLC conducted an evaluation of Riggins and issued a report on July 27, 2013. Patterson concluded Riggins did not have "a mental health condition" or present any signs of domestic violence and did not recommend treatment. The report addressed Riggins' response to Cuhaciyan accidentally locking the baby in the car.

> "There are concerns about the presence of domestic violence, specifically in regard to the client's [sic] raising his voice at the partner when their son was locked in a car. . . . The client reported he did not use profanity, was not personally insulting, or made any threats. If this is accurate, it's not unreasonable to have heightened emotional response, including raising one's voice or your voice, in an emergency situation. In this case, the emergency situation was one where a one-month-old infant was locked in a car. It was after this conversation that the partner took steps to get the infant out of the car. The client did not present with any other signs or history of aggressive behavior or domestic violence."
>     . . . .
>     . . . "In my professional opinion, the client's response and actions are not the result of any social deviance, abusive, or other personality disorder patterns, all factors that contribute to the patient's control and response, and include his own family history, where as a child he was taken from his father and placed in a chaotic, dangerous environment. It is reasonable the client would be triggered by a similar event and react

with more emotional intensity than someone who does not have that in their own history."

On November 12, 2013, the court entered an order establishing a parenting plan and an order of child support. The parenting plan designates Cuhaciyan as the residential parent and gives Riggins residential time on Tuesday and Thursday from 4:00 p.m. to 8:00 p.m. and every other weekend from Saturday morning until Sunday evening. The parents alternate holidays with the child in odd and even years. The parenting plan requires joint decision making on education decisions, nonemergency health care, and extracurricular activities. The parenting plan states Riggins should "undergo screening for power/control issues" and Cuhaciyan should attend "Domestic Violence Survivors Orientation." But the parenting plan did not include any restrictions under RCW 26.09.191.

The order of child support required Riggins to pay $400 a month and each parent to pay 50 percent of educational and extracurricular expenses not covered by the transfer payment.

The parents followed the parenting plan "without major incident" until the end of November 2014. Cuhaciyan worked full time and her mother took care of Jacob. Beginning in approximately September 2014, Jacob started attending preschool/day care on Monday, Wednesday, and Friday.

November 2014 Injury to Jacob

On Thanksgiving Day, November 27, Riggins picked up Jacob at about 9:00 a.m. and went to his father and stepmother's house. Jacob "interacted with" Riggins' family and friends with "a lot of hugs going around." During Thanksgiving dinner, two-and-a-half-year-old Jacob sat on Riggins' lap most of the time. Jacob "mentioned" that "a boy

named Wesley . . . had bit him" but he never said he was in pain. When Riggins changed Jacob's diapers, he did not see any bruises.

Riggins returned Jacob to Cuhaciyan's mother at approximately 7:00 p.m. Cuhaciyan then took Jacob to spend the night with her boyfriend Ryan Best and his three-year-old son Wesley at Best's house in Lake Stevens.

Unbeknownst to Riggins, Cuhaciyan had been romantically involved with Best for approximately five months. Cuhaciyan, Jacob, Best, and Wesley spent Thursday night and all day Friday together. On Saturday, November 29, Cuhaciyan bathed Jacob at approximately 7:15 a.m. Cuhaciyan said she did not see any bruises on Jacob but she did see "a couple of red marks" on his back, a bump on his head, and a bite mark.

At 9:00 a.m., Riggins went to Third Place Books in Lake Forest Park to pick up Jacob. Cuhaciyan, Best, Wesley, and Jacob were together. When Jacob saw Riggins, he immediately ran over to give him a hug. Riggins said this was the "first time" he saw Cuhaciyan's "friend." According to Riggins, it appeared there was "some tension going on" between Cuhaciyan and her friend. When Best refused to shake his hand or introduce himself, Riggins felt "awkward" and left.

After Riggins and Jacob left, they went to Ross to look at shoes and buy a toy. Jacob asked Riggins to lift him up to get a box of shoes. Riggins said, "As soon as I went to lift him up, he complained of pain under his underarms." Jacob told Riggins that he had " 'owies' " and that "Wesley's daddy hurt him." Riggins asked Jacob to show him. When Jacob pulled up his shirt, Riggins saw dark bruises. Riggins sent Cuhaciyan a text message asking her what happened but she "didn't really want to

5

address it."

Q. A. At first I didn't think anything of it. And so I set [Jacob] down and asked him, "Are you all right?" And he said, "Yes." And I — he says, "I got hurt. I got owies." And he lifted up his shirt and told me that Wesley was biting him. And at that time I didn't see the bruises on the back or the underarm, just the — just some red marks on the belly. And then within seconds after that he starts telling me this story of how Wesley's daddy hurt him and "I got owies here and I got owies here, Daddy." And I was like, "Okay." Well, I didn't really take him too serious because kids say things. So I asked him, "Can you show me your owies, you know?" And then he pulled up his shirt and I saw the bruises and, oh, man, it was — I was immediately just — I just started crying because I knew something bad had happened. I could sense something bad was going on when I picked him up. There was — they were arguing about something, and I didn't know what to do.

Q. So what did you do next?

A. You know, I didn't know what to do, so I — the first thing I — I wanted to do was find out what had really happened.

Q. Okay.

A. I didn't know who Wesley's daddy was, so I asked Christine to tell me what had happened and that Jacob was reporting that he got hurt by somebody named Wesley's daddy. And she didn't really want to address it.

Riggins called his father and stepmother. His stepmother told him to contact the police. Riggins sent Cuhaciyan a text message telling her he was going to contact the police and he did not want her friend around Jacob anymore. In response, Cuhaciyan said Jacob "didn't have any marks" when she dropped him off with Riggins.

Riggins contacted the police. When King County Sheriff's Deputy Steven Lysathe arrived, Riggins showed him the bruises on Jacob. Deputy Lysathe saw "bruising around his armpits and back, upper back."

Deputy Lysathe said Riggins was "completely calm, polite, and we actually had a rather pleasant, I would say 30- to 40-minute conversation regarding the incident he was reporting. We had a decent rapport." But when Deputy Lysathe told Riggins that

he had to contact Child Protective Services (CPS), "his demeanor changed instantly." Riggins began to "hyperventilate and looked a little bewildered and disoriented . . . . As though he were being threatened."

Riggins told Deputy Lysathe to leave the house. Riggins took Jacob, ran into the kitchen, and began opening drawers or cabinets. Deputy Lysathe ordered Riggins to come out of the kitchen with his hands up. When Riggins refused, Deputy Lysathe left and called for backup. The police later convinced Riggins to come out of the house with Jacob. Meanwhile, Riggins' father and stepmother arrived. Riggins' stepmother went with Jacob in an ambulance to Seattle Children's Hospital. The police did not arrest Riggins. Riggins and his father left to go to the hospital.

Dr. Ken Feldman examined Jacob. There were "no fractures or skeletal issues." Medical staff photographed the bruises on Jacob's back and under his armpits. Dr. Feldman concluded the "significant bruising" was "non-accidental and abusive in nature."

When Riggins' stepmother Maria Riggins and hospital social worker Sharla Semana went with Jacob to get the skeletal exam, Jacob spontaneously told Maria, "Wesley's daddy hurt him and threw him on the couch." Maria asked Jacob whether it was " 'for fun or for hurt.' " Jacob responded, " 'For hurt.' " The hospital released Jacob to Riggins' father and stepmother.

Cuhaciyan agreed to meet with the police and CPS investigator Nicole Gorman. Cuhaciyan asked if her parents and her boyfriend Ryan Best could also attend the meeting. At the meeting, Cuhaciyan was adamant that other than a bite mark and a small mark on his forehead, she did not see any bruising on Jacob before she brought

7

him to the exchange Saturday morning. Cuhaciyan said Jacob bruises easily because

he is a vegetarian.

> Christine said she was going to return Jacob to Riggins per their agreed
> upon schedule and gave him a bath that morning. She said she did not
> see any bruising or injury to Jacob other than a bite mark, which she said
> was caused by Best's son, Wesley. Christine said there was also a small
> mark on his forehead where he had bumped his head on a chair a few
> days earlier. However, she did not see any bruising or marks on his body.
> Christine said she and Jacob are vegetarians and as such he bruises
> easily.

> . . . Christine said Riggins was "clearly upset" that Best was at the
> restaurant. A short time after they left, Christine started getting text
> messages from Riggins stating that Jacob had bruises all over him and
> told him that "Wesley's dad threw me on a couch." Christine said she had
> no idea what he was talking about, but felt this was yet another attempt by
> Riggins to force Best out of her life. Christine was adamant that Jacob
> was not injured when she took him to meet Riggins and has been in her
> care or the care of her parents the entire time.

Christine told the police and CPS that Riggins often throws Jacob in the air and

maybe Riggins caused the bruising.

> Christine went on to state that Riggins often "throws Jacob up in the air"
> and catches him, and maybe that is where the bruising he saw came from.
> However, she again denied that there was any bruising or injury on Jacob
> the morning he was returned to Riggins.

> Best told the police and CPS that his son Wesley bit Jacob but denied causing

any bruising or injury to Jacob.

> [Best] denied the allegations and said he had never handled Jacob in a
> rough manner or even spanked him. I asked Best if it was possible that
> Jacob was about to fall or get hurt in some way and perhaps he grabbed
> Jacob a little more firmly to keep him from getting hurt. Best said there
> has never been such an occasion and he again denied bruising or injuring
> Jacob. I asked about the bite mark. Best said his son, Wesley (3 years
> old) bit Jacob and was later scolded for the action. Best told me he had
> never watched or cared for Jacob alone and that Christine has always
> been there with him.

8

After the meeting, the police spoke to Dr. Feldman about the injuries and whether being a vegetarian or throwing the child in the air could cause the bruising. Dr. Feldman said the bruising was not consistent with being a vegetarian or throwing Jacob in the air and catching him. Dr. Feldman said the injuries were "consistent with being grabbed under his armpits and squeezed very hard, most likely from the front." Dr. Feldman reiterated the bruising was "non-accidental."

> Dr. Feldman told me the bruising on Jacob was consistent with being grabbed under his armpits and squeezed very hard, most likely from the front. He further stated that the small bruising on Jacob's back may have been caused by the fingers of whoever squeezed Jacob. I asked about Jacob being vegetarian and if this would cause bruising of this nature or would allow Jacob to bruise easier than a non-vegetarian. Dr. Feldman told me that while it's possible for a vegetarian to bruise easily, he would expect that there would be other bruising on "commonly bruised areas" such as knees and elbows for a child that age. He went on to state that the armpits are a fairly protected area and not usually susceptible to bruising of this nature. He said the bruising appeared non-accidental. I also asked if it was possible that the child was thrown into the air and caught as Christine suggested Ryan Riggins would do to Jacob. Again, Dr. Feldman stated that the bruising did not appear consistent with that type of action, but was consistent with the child being picked up and squeezed very hard.

Dr. Feldman requested CPS establish a safety plan for Jacob. Dr. Feldman said it was unlikely the father caused the bruising " 'based on the time frame.' " On December 2, 2014, CPS met with the mother, the father, and the grandparents. Cuhaciyan denied that either she or Best abused the child. CPS decided Jacob should remain with his paternal grandparents "until it could be determined how Jacob was injured."

At a hearing on January 6, 2015, the court reinstated the November 12, 2013 parenting plan and entered a temporary protection order. The protection order states Best "is not allowed near [the] child" and Cuhaciyan "is restrained from allowing Mr.

Ryan Douglas Best within 100 feet of the minor child Jacob Cuhaciyan Riggins" until further court order.

Petitions to Modify Parenting Plan

On January 26, 2015, Cuhaciyan filed a petition for a minor modification of the November 12, 2013 parenting plan and a petition for a domestic violence protection order (DVPO) against Riggins. Cuhaciyan alleged Riggins engaged in behavior detrimental to Jacob and sought sole decision making because the parties were unable to communicate. Cuhaciyan also sought an order requiring Riggins to obtain a mental health and a domestic violence evaluation and "follow all recommendations, if any."

The court found adequate cause for the minor modification filed by Cuhaciyan and appointed a CASA. The court denied Cuhaciyan's request for a DVPO. The order states, "A preponderance of the evidence has not established that there is domestic violence."

On February 3, 2015, CPS conducted a second safety plan assessment. Because Cuhaciyan had " 'ceased contact with her son and her ex-boyfriend, Ryan Best,' " CPS decided Jacob could return to the mother's household. CPS closed the case "with SDM, Structured Decision Management Risk Assessment 'Moderate to High' as to the mother's home, SDM as to 'Moderate' in the father's home."

On February 5, Riggins filed a petition for a major modification of the parenting plan. Riggins sought sole custody of Jacob. Riggins alleged Cuhaciyan "is incapable of caring for the child and keeping the child safe."

> The mother's household poses a significant detriment to the child's physical, emotional and mental well-being. It was recently discovered that the child was physically abused while in the mother's care. Rather than help determine the reason for the documented injuries, which were

confirmed by healthcare providers at Seattle's Children's Hospital, the mother engaged in acts of protecting her boyfriend whom is alleged as the potential abuser of the child.

The court found adequate cause for the major modification filed by Riggins.

In August, Riggins filed a motion to find Cuhaciyan in contempt for failing to comply with the residential schedule. Cuhaciyan and Best attended the show cause hearing on August 19. The court found Cuhaciyan in contempt for intentionally violating the parenting plan by failing "to bring the child to regularly scheduled visitation on 7.9.15, 7.11.15, and 7.23.15." The court ordered "make up time for the missed visitation" and ordered Cuhaciyan to pay attorney fees and costs.

Riggins asked Cuhaciyan to bring Jacob's scooter to the exchange on August 20. When Cuhaciyan and Best arrived at the exchange, the scooter was broken in half.

The CASA filed a report on September 15, 2015. The CASA recommended pending trial, Cuhaciyan remain the residential parent and that she engage in domestic violence counseling. The CASA recommended that Riggins spend residential time with Jacob every Wednesday from 4:00 p.m. to 7:00 p.m., with pickup at day care and drop-off at Third Place Books, and that he obtain a mental health evaluation and a domestic violence assessment. The CASA report states that "the mother's boyfriend, Ryan Best, should continue to be around the child only under the supervision of another adult." The report states Cuhaciyan "should not permit Ryan Best to be present at exchanges." The report notes the court found Cuhaciyan in contempt on August 19, 2015 for "failing to bring the child to regularly scheduled visitation," and as of the date of the report, "the mother has not provided the father with makeup [sic] time."

A month before trial, the CASA filed an updated report. The March 4, 2016 report states Riggins complied with the requirement to obtain another mental health evaluation. According to the updated report, Dr. Kenneth Asher met with Riggins several times and conducted a thorough evaluation of him. Dr. Asher recommended Riggins should " 'play a more active role,' " including more residential time with his son.

> Overall, Dr. Asher expressed that Mr. Riggins is devoted to his son, and stressed that he wishes to maintain a respectful and constructive relationship with the mother. The evaluation concluded that, "There is no psychologically-based reason that he should not play a more active role in raising his son Jacob. This would include more time in general, overnight residential visits, and a holiday special day contact extending over two or more days. It would also include substantial participation in important decisions affecting Jacob."

The updated report states that Riggins completed a Family Court Services (FCS) domestic violence risk assessment in December 2015. The reported concern was a "power and control dynamic."

> The concern of domestic violence between the mother and father is not about physical violence but about the power and control dynamic the father has engaged in. I am not worried about the physical safety of Jacob while in the father's care, but the father's blatant lack of respect for the mother and constant fixation on talking about and attempting to find fault with her is concerning and could have a negative effect on Jacob.

The CASA recommended Cuhaciyan continue as the designated residential parent with "sole decision-making authority due to the history of domestic violence and high conflict." The CASA recommended a phased-in expansion of Riggins' residential time with Jacob Wednesday after preschool to Thursday morning and every other weekend.

Trial

The four-day trial on the petition for minor modification and the petition for major

modification began on April 5, 2016. The FCS social worker and the CASA testified. Cuhaciyan testified and called Deputy Lysathe and expert witness Nurse Practitioner Mary Shelkey. Riggins testified and called his stepmother Maria Riggins, Patrick Carey, and hospital social worker Sharla Semana. The court admitted into evidence over 40 exhibits, including the Seattle Children's Hospital photographs of Jacob's injuries, the King County Sheriff report, the September 15, 2015 CASA report, the updated March 4, 2016 CASA report, the mental health evaluations of Patterson and Dr. Asher, and photographs of the broken scooter.

FCS social worker Elly Khosravi testified that she conducted a domestic violence risk assessment of Riggins. Khosravi testified her definition of "domestic violence" is a "behavioral definition," not the statutory definition.

Khosravi said there was no verbal or physical violence in the relationship. Riggins never "verbally threatened to physically harm" Cuhaciyan. Khosravi believed Riggins showed a pattern of controlling behavior but there were "no other allegations or information to suggest a pattern of assault."

Khosravi admitted her assessment was based on what Cuhaciyan told her and the information was not "verified in any way." Khosravi said her "risk assessment didn't incorporate specifically the impact on the child," she did not perform an assessment of Cuhaciyan, and she "did not assess for abusive use of conflict." Khosravi also testified that the incident between Riggins and Deputy Lysathe and ordering Riggins to come out of the kitchen with his hands up "did not have a major, if any, impact on my recommendations or my risk assessment, as it pertains to domestic violence."

Khosravi testified the parties "have high conflict." But she had no knowledge of any conflict between the parties after entry of the parenting plan "in November of 2013 until November of 2014 when allegations of abuse on behalf of the child were made." Khosravi testified, "To the best of my knowledge," there were "12 months of conflict-free interactions in that period of time."

CASA Lauren Melvin testified that both parents have a strong bond with Jacob. Melvin recommended the parents to use e-mail and only communicate about the child. Melvin recommended prohibiting both parents from speaking negatively about each other.

Melvin testified about her review of the police and CPS records and her conversation with the preschool administrator and CPS social worker Haley Johnston.

Melvin testified the recommendation to prohibit Ryan Best from spending unsupervised time with Jacob was because there was "not evidence to rule him out." Melvin explained that it was "beyond the scope of the role of a CASA" to determine "who or how the bruises came to Jacob."

> Our role is to look at records available to us, which in this case included CPS records and police reports and a request for medical records which were not obtained. Our role is not to seek experts. We just review records. And we felt we had adequate records reviewed, and we came to the same conclusion that the experts came to, which is it was not clear who or how the bruises came to Jacob.[2]

Melvin testified the preschool administrator "never had any previous concerns about Jacob's health or safety" but described an experience with Best as "not

---

[2] The updated CASA report states:
The interviews summarized below reflect what individuals told me during those interviews and DO NOT reflect determinations on my part as to the veracity, relevance, or accuracy of the information therein.
(Boldface and italics omitted.)

good."

> [The administrator] said she did meet [Best] one time and described it as not good, that he was very upset over — it had something to do with meals, she couldn't remember all the details, and that was the only — that's the only time that she is [sic] talked to him, but he was a little aggressive in that conversation.

Melvin said CPS social worker Johnston said that when she interviewed Jacob, he " 'reported positive things about both homes.' " But Jacob " 'did clearly tell Ms. Johnston that he did not like the mother's boyfriend.' " Jacob " 'reported that the mother's boyfriend "squeezes" ' " him.

Cuhaciyan testified that she and Jacob spent the Wednesday night before Thanksgiving with her boyfriend Ryan Best and his son Wesley. After Jacob spent Thanksgiving Day with Riggins, Cuhaciyan went to her mother's house to get Jacob and bring him to Best's house.[3]

Best, Wesley, Cuhaciyan, and Jacob were together all day Friday. Cuhaciyan said she spent some time on the computer Friday morning trying to buy a car seat on Craigslist. Cuhaciyan testified that while she was on the computer, Wesley and Jacob were with Best in another room. Cuhaciyan testified that she "frequently" saw Best "throw his son Wesley on the couch" and "throw[ ] Jacob on the couch," but the children were "[g]iggling and laughing and playing." Cuhaciyan said Best never caused any bruising to Jacob or Wesley.

Cuhaciyan testified that on the morning of Saturday, November 29, she gave Jacob a bath at approximately 7:15 a.m. Cuhaciyan said, "I pick him up and put him in" the bathtub and afterword, "I pick him up" and "take him out" of the bath and help Jacob

---

[3] Cuhaciyan testified that it was possible Riggins "saw" Best for the first time at the Thanksgiving exchange on the morning of November 27, 2013 but admitted Riggins "had never met" Best before the exchange on November 29.

15

"dry himself off." Cuhaciyan testified that she saw a "couple of red marks" on his back but no bruising. Cuhaciyan testified that Jacob "never mentioned bruises" to her while "going into the bath and being dried off" or while "getting undressed and getting dressed."

According to Cuhaciyan, she and Best took a break from their relationship after November 29, 2014 but resumed their relationship in spring 2015. Cuhaciyan said that after they got back together, Best went with her to the transfers of Jacob to Riggins. Cuhaciyan admitted Riggins told her he did not want Best at the transfers but she continued to ask Best to come with her.

Cuhaciyan said that in September 2015, she enrolled at Northwest University in Kirkland to obtain a master's degree in psychology. Cuhaciyan testified that one of the reasons she left Riggins was "because I don't feel like I had my opinions heard or valued." Cuhaciyan conceded she told the CASA that there was no physical violence toward her or Jacob and that she was not concerned Riggins posed a threat to her. Cuhaciyan testified that she and Riggins and their families love and care for Jacob. Cuhaciyan agreed it was possible to coparent with Riggins.

Cuhaciyan called Nurse Practitioner Mary Shelkey as an expert witness. Nurse Shelkey agreed with Dr. Feldman that the bruising under Jacob's armpits was "non-accidental" and consistent with intentionally grabbing the child on both sides and squeezing. Nurse Shelkey testified that on a more probable than not basis the bruising in the photographs "are not accidental."

> And again, based on the fact that [the bruises] are seemingly rather symmetric on either side, but they involve not only the armpit but the upper arm of the child.

16

I will tell you that most of my opinion is based on the symmetry. Accidental wounds do not occur in this particular type of fashion unless a child is dropped by someone else.

But Nurse Shelkey testified that while Dr. Feldman's opinion "would explain the armpit bruising," it did not explain the linear bruises on the upper arms and back.

According to Nurse Shelkey, there is "no way anymore anyone believes that you can actually date a bruise." However, based on the photographs that showed "yellowing" of the bruising, she was "80 to 90 percent" certain the bruising did not happen within the 36 hours before Dr. Feldman examined Jacob.

Maria Riggins testified that when Riggins was eight-years-old, CPS placed him with his father and her. Maria said that on Thanksgiving 2014, there were approximately 20 people at the house and different family members picked up and interacted with Jacob, but he never expressed any pain or discomfort.

Maria testified that while walking with Jacob and the hospital social worker to the skeletal exam, Jacob said that "Wesley's daddy hurt him and threw him in the couch" and it was " '[f]or hurt.' "

A. So when we went to the skeletal room, we were in there. And then, when the social worker was walking us down the hall, we — nobody was saying a word.
Q. Okay.
A. Okay. And then Jacob just started iterating, you know, how Wesley's daddy hurt him and threw him in the couch. And I said, "Oh, was that for fun or for hurt?" And he said, "For hurt."

Maria attended a number of the exchanges. Maria described Best as "[a] little threatening and — and acting kind of pompous and — and flipping me off and different things like that." Maria testified that Riggins was never hostile or intimidating at the

17

exchanges.

> The situation got increasingly agitated when Mr. Best was present at the exchanges, and [Riggins] was fearful that things would escalate. So there were several times that either myself or John [Riggins] would show up or be there without somebody knowing to make sure that the exchange happened, you know, appropriately and that there were no altercations.

Patrick Carey worked for Riggins. Carey attended at least half of the exchanges with Riggins. Carey said he "didn't really see much extensive conflict until Mr. Best came into the scene." Carey described Best's behavior as "verbal harassment and attempts at intimidation . . . of Mr. Riggins." Carey said Riggins never attempted to intimidate Best or Cuhaciyan. Carey described the "strong bond" between Riggins and Jacob.

Seattle Children's Hospital social worker Sharla Semana testified that she overheard Jacob tell Maria that Best threw him on the couch and "it hurt."

> A.  . . . I heard the patient saying to the grandmother, "Wesley's daddy tossed me on the couch." And then the grandmother had wanted to ask the — the patient if it was for fun or if it hurt and — to which I did hear Jacob say it hurt. And that's all I heard.
> Q.  Okay. Did you hear Jacob express at any time that he missed his daddy?
> A.  I did.
> Q.  And was that something that he said more than once?
> A.  Yes.

Riggins testified that when Cuhaciyan locked Jacob in the car, he was very anxious about his son and later apologized to Cuhaciyan. Riggins testified he did not know what Cuhaciyan told the CASA, but he never threatened or assaulted Cuhaciyan in any way. Riggins said he has a medical marijuana prescription card and consumed marijuana only at night for back pain.

Riggins testified that when Deputy Lysathe told him the police had to contact CPS, his own experiences with CPS as a child triggered an anxiety attack.

> A.    And the reason I was having anxiety is because I've had a brother and a sister that when I was very young and — half-brother and sister on my mother's side, I've lost both [of] them as a result of CPS trying to do their job and place them other places. And along —
>
> Q.    So let's just stop this for a moment.
>
> A.    Okay.
>
> Q.    So your brother, he was an older half-brother; is that correct?
>
> A.    Younger half-brother.
>
> Q.    Younger half-brother?
>
> A.    Yes.
>
> Q.    And there was CPS involvement in your biological mother's home; is that right?
>
> A.    Correct.
>
> Q.    And that child was placed with a foster family; is that right?
>
> A.    Yes.
>
> Q.    And ultimately, through events that happened to him, he died; is that correct?
>
> A.    That's correct.

Riggins testified that CPS placed him in a "shelter" when he was seven-years-old and then with his father and his stepmother when he was eight-years-old.

Riggins testified that he was proposing a parenting plan with a week on and week off residential schedule with the transfers on Wednesday at preschool.

At the conclusion of trial, the court reserved ruling but noted, "I think one of the most striking features of the testimony in this case is how well this child does in the homes of each parent."

On May 3, 2016, the court entered an order modifying the parenting plan under RCW 26.09.260(1) and (2) and an order of child support. The order modifying the parenting plan states, in pertinent part:

> The parenting plan/residential schedule should be modified because a substantial change has occurred in the circumstances of the child, or of

the nonmoving party, and the modification is necessary to serve the best interest of the child. This finding is based on the factors below:

> The child's environment under the custody decree/parenting plan/residential schedule is detrimental to the child's physical, mental or emotional health and the harm likely to be caused by a change in environment is outweighed by the advantage of a change to the child.

The following facts, supporting the requested modification, have arisen since the parenting plan or were unknown to the court at the time of the parenting plan:

The Mother's household poses a significant detriment to the child's physical, emotional and mental well-being. The Mother failed to adequately safeguard the child, resulting in his injuries.

The Mother has engaged in extensive litigation and conflict with the Father by bringing her boyfriend to exchanges and by interfering with the Father's visitation with his son.

The court further incorporates here, as if fully set forth herein, the supplemental findings entered this date.

The order identifies the substantial change in circumstances as follows:

The Mother's household poses a significant detriment to the child's physical, emotional and mental well-being. It was discovered the child was physically abused while in the mother's care.

The mother filed a Petition seeking an Order of Protection against the father, alleging the father failed to safeguard the child and is violent towards her and the child. All of the Father's residential time was suspended pending a hearing with James Kahan on January 6, 2015, on the mother's Petition to Establish a Domestic Violence Protection Order. The matter was continued, but not before Commissioner Kahan reinstated the November 12, 2013, permanent parenting plan immediately restoring the Father's residential time with the child. Commissioner Kahan placed restrictions upon the mother, prohibiting her from exposing the child to her boyfriend, Ryan Best, and prohibiting Ryan Best from coming anywhere near the child. The mother then voluntarily dismissed her Petition for Protection acknowledging there was not a preponderance of evidence to support the Petition for Protection.

As a result of the dismissal of the DVPO, the protections expired, leaving

the child unprotected.

The child is placed at serious risk of harm by the Mother's boyfriend if the Mother continues to fail to safeguard the child.

. . . . .

. . .     Mother is to ensure the boyfriend, Ryan Best, is not left alone with the child without another adult (not a relative of Ryan Best) who has been provided a copy of this order, and has read it, being present with them.

The court incorporated "Supplemental Findings" as part of the order modifying

the parenting plan.  The Supplemental Findings state, "The following supplemental facts

. . . support[ ] the requested modification":

On November 29, 2014, the Respondent (hereafter referred to as the father, for purposes of clarity; the Petitioner will be referred to as the mother.  No disrespect is intended) received the child from the mother to begin his residential time.  When lifted by his father under the arms, the child complained of pain.  The father asked, but the mother had no answer for the child's complaints of pain.  (EX.[4] 4)

Later that evening the father lifted the child's shirt and observed bruising under both armpits.  The father called the mother and asked about the origin of the bruising, and she told him she bathed the child that morning and there was no bruising at that time, or that she did not observe any bruising.

The Supplemental Findings also state, "It is not disputed that the bruises were

'non-accidental traumatic injury' to the child, and that the bruising occurred prior to the

exchange between the mother and the father on November 29, 2014."

On examination at Seattle Children's Hospital later that evening, pictures of the bruising were taken.  It is not disputed that the bruises were "non-accidental traumatic injury" to the child, and that the bruising occurred prior to the exchange between the mother and the father on November 29, 2014.

---

[4] Exhibit.

21

The court found that "[d]uring all time relevant to the bruising incident, the mother has had a relationship with Ryan Best, and she and the child were in the presence of Ryan Best, hereafter (RB), in the days preceding the discovery of the bruising." The court found the testimony at trial established that Best " 'squeezed' " Jacob.

> The testimony submitted at trial established that the child told the CPS social worker that (RB) "squeezed me." (Testimony of Lauren Melvin and CASA Lindsey Cameron). The hospital social worker, Sharala [sic] Semana, testified that she observed the child when he was in the hospital and heard him say that (RB) threw him on a couch, and "it hurt." Mother corroborated that (RB) threw (or tossed) the child on a couch "in play."

The court concluded Jacob's bruising occurred while he was in Cuhaciyan's care and she "knew, or should have known, of the bruising not later than the morning of November 29, 2014 when the child was bathed by the mother."

The court found by a preponderance of the evidence that Jacob's bruising "was intentional" and his injuries were done by Best "in anger and not in play." The court concluded Jacob was "at serious risk of harm" by Best if Cuhaciyan "continues to fail to safeguard the child."

The court also found by a preponderance of the evidence that Best "intentionally" broke the scooter.

> Mother brought (RB) to exchanges of custody of the child until it became too disruptive. On one exchange the child's scooter had been carried to the exchange in the bed of (RB's) truck, in which there was also electrical equipment used by (RB) in his employment. The scooter was not broken when it was last previously delivered to the mother, but it was broken when it was returned to father. See EX. 222. Mother's explanation was that it was broken sliding around in the bed of (RB's) pickup truck, and possibly by colliding therein with electrical equipment.

The court did not impose any restrictions under RCW 26.09.191. The parenting plan adopts a 50/50 alternating week residential schedule. The parenting plan states

each parent shall make decisions about the daily care of Jacob while he is residing with that parent. The order of child support required Cuhaciyan to pay $484.13 a month in child support.

Motions to Reconsider

The court denied Cuhaciyan's motion to reconsider the order modifying the parenting plan. The order states:

> This matter came before the Court on Petitioner's Motion for Reconsideration. The Court considered and weighed the testimony of all witnesses at trial, including the Petitioner's expert witness, and the recommendations of the CASA prior to issuing its decision. The Court adheres to its previous ruling, and DENIES Petitioner's Motion for Partial Reconsideration.

On June 8, 2016, Cuhaciyan filed a motion to reconsider the child support order. Cuhaciyan requested a deviation based on relatively equal incomes and the 50/50 residential schedule. Cuhaciyan asked the court to address childcare expenses.

On June 9, Cuhaciyan filed a notice of appeal of the May 3, 2016 order modifying the parenting plan, the supplemental findings, the parenting plan, and the order of child support.

On June 21, the court granted Cuhaciyan's request for a deviation. The court entered an amended order with $0.00 in child support to correct "what was obviously a clerical error concerning the transfer payment order." The child support order worksheets do not address allocation of expenses.

On July 7, the court entered a second amended order of child support. The order deleted the requirement to exchange financial documents and allocate income tax exemptions. Neither the child support order nor the worksheets address payment of

expenses not included in the transfer payment. On August 5, Cuhaciyan filed a notice of appeal of the July 7, 2016 amended order of child support.[5]

Order Modifying Parenting Plan

Cuhaciyan contends the court disregarded the strong presumption against modification of a parenting plan and substantial evidence does not support the order modifying the parenting plan. The record does not support her argument.

"Custodial changes are viewed as highly disruptive to children, and there is a strong presumption in favor of custodial continuity and against modification." In re Marriage of McDole, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993). "Nonetheless, trial courts are given broad discretion in matters dealing with the welfare of children." McDole, 122 Wn.2d at 610.

We review the decision to modify a parenting plan for abuse of discretion. In re Marriage of Zigler, 154 Wn. App. 803, 808, 226 P.3d 202 (2010). Trial courts are given broad discretion in matters concerning children, and a reviewing court will not disturb a trial court's disposition of a case involving the rights of custody and visitation unless the trial court manifestly abused its discretion; that is, the decision is untenable or unreasonable. McDole, 122 Wn.2d at 610; Zigler, 154 Wn. App. at 808-09. A court's decision is manifestly unreasonable or based on untenable grounds if it is outside the range of acceptable choices given the facts and the applicable legal standard, or if the factual findings are unsupported by the record. In re Marriage of Fiorito, 112 Wn. App. 657, 664, 50 P.3d 298 (2002).

We will uphold the trial court's findings of fact if supported by substantial evidence. McDole, 122 Wn.2d at 610.[6] Substantial evidence is sufficient evidence to

---

[5] We consolidated the appeals.

persuade the fact finder that a particular finding is true. In re Marriage of Drlik, 121 Wn. App. 269, 274-75, 87 P.3d 1192 (2004). We review the evidence and reasonable inferences therefrom in favor of the respondent. Zigler, 154 Wn. App. at 812.

"So long as substantial evidence supports the finding, it does not matter that other evidence may contradict it." In re Marriage of Burrill, 113 Wn. App. 863, 868, 56 P.3d 993 (2002). Unchallenged findings are also verities on appeal. In re Marriage of Brewer, 137 Wn.2d 756, 766, 976 P.2d 102 (1999).

This court does not review the trial court's credibility determinations, nor can it weigh conflicting evidence. In re Marriage of Meredith, 148 Wn. App. 887, 891 n.1, 201 P.3d 1056 (2009). Because of the unique opportunity to observe the parties, this court is extremely reluctant to disturb the trial court's findings. In re Parentage of Schroeder, 106 Wn. App. 343, 349, 22 P.3d 1280 (2001).

Modification of a parenting plan is prescribed by RCW 26.09.260 and compliance with the statute is mandatory. In re Marriage of Tomsovic, 118 Wn. App. 96, 103, 74 P.3d 692 (2003). A court may modify a parenting plan only if there is a substantial change in the circumstances of the child and the modification is in the best interest and necessary to serve the best interests of the child. RCW 26.09.260(1). These findings must be based on "facts that have arisen since the prior decree or plan or that were unknown to the court at the time of the prior decree or plan." RCW 26.09.260(1).

Here, the court modified the parenting plan under RCW 26.09.260(1) and (2). RCW 26.09.260 provides, in pertinent part:

> (1) Except as otherwise provided in subsection (4), (5), (6), (8), and (10) of this section, the court shall not modify a prior custody decree or a

---

[6] A trial court's findings of fact are verities on appeal if they are supported by substantial evidence. In re Marriage of Chandola, 180 Wn.2d 632, 642, 327 P.3d 644 (2014).

parenting plan unless it finds, upon the basis of facts that have arisen since the prior decree or plan or that were unknown to the court at the time of the prior decree or plan, that a substantial change has occurred in the circumstances of the child or the nonmoving party and that the modification is in the best interest of the child and is necessary to serve the best interests of the child. . . .

(2) In applying these standards, the court shall retain the residential schedule established by the decree or parenting plan unless:

. . . .

(c) The child's present environment is detrimental to the child's physical, mental, or emotional health and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child.

Cuhaciyan concedes the evidence supports the finding that the bruising on Jacob was intentional. Cuhaciyan argues substantial evidence does not support finding that the bruising occurred while the child was in her care or that Ryan Best intentionally injured Jacob in anger. Cuhaciyan asserts the court impermissibly relied on hearsay and speculation. Cuhaciyan points to the hearsay evidence of the statements in the police reports, the hearsay testimony of the CASA, and the hearsay statements of Dr. Feldman. Riggins asserts Cuhaciyan waived her right to assert a hearsay objection for the first time on appeal.

It is well settled that objections to evidence cannot be raised for the first time on appeal. Sepich v. Dep't of Labor & Indus., 75 Wn.2d 312, 319, 450 P.2d 940 (1969). " 'Error may not be predicated upon a ruling which admits . . . evidence unless . . . a timely objection or motion to strike is made, stating the specific ground of objection, if the specific ground was not apparent from the context.' " Zigler, 154 Wn. App. at 810[7] (quoting ER 103(a)(1)).

Here, Cuhaciyan introduced into evidence the police reports as exhibit 4. Without objection, the court also admitted the CASA reports and the CASA testified

---

[7] Alterations in original.

extensively about the contents of the reports, including CPS records and her conversation with CPS social worker Haley Johnston.

During opening statement, Cuhaciyan's attorney objected to the statements of Dr. Feldman as hearsay. But during the trial, Cuhaciyan did not object to testimony about Dr. Feldman's statements or his opinion. Instead, Cuhaciyan specifically asked her expert witness Nurse Shelkey about Dr. Feldman's opinion and whether Nurse Shelkey agreed with his description of how the injuries to Jacob occurred. Cuhaciyan also did not raise any objection to the testimony about what Jacob told CPS social worker Johnston or the testimony of Maria Riggins or Seattle Children's Hospital social worker Semana about what Jacob said at the hospital. We decline to exercise our discretion to consider Cuhaciyan's objection raised for the first time on appeal to the reports and testimony.

The record supports the finding that Cuhaciyan's household "poses a significant detriment to the child's physical, emotional and mental well-being" because "the child was physically abused while in the mother's care" and Best intentionally inflicted the bruises on Jacob in anger. The testimony supports finding that the injuries to Jacob occurred while he was with Cuhaciyan and Best. Jacob was with Cuhaciyan and Best from approximately 7:00 p.m. Thursday to 9:00 a.m. Saturday, or 38 hours. Jacob told Riggins that Best hurt him and complained of pain under his arms.

Riggins' stepmother Maria testified that while at the hospital, Jacob spontaneously told her that "Wesley's daddy hurt him and threw him in the couch." Hospital social worker Semana testified that she overheard Jacob tell Riggins' stepmother that " 'Wesley's daddy tossed me on the couch' " and " 'it hurt.' " CPS social

27

worker Johnston reported that Jacob said he " 'did not like the mother's boyfriend' " and " 'the mother's boyfriend "squeezes me." ' " The evidence established that Dr. Feldman concluded the bruising was "consistent with being grabbed under his armpits and squeezed very hard." Cuhaciyan's expert witness Nurse Shelkey agreed with Dr. Feldman that the bruising under Jacob's armpits was "not accidental" and was consistent with intentionally grabbing the child on both sides and squeezing. The police report states Jacob told Riggins that Wesley's father "picked him up, shook him and threw him onto a couch."

Substantial evidence also supports the finding that Cuhaciyan knew or should have known about the bruising the morning of November 29, 2014 when she gave Jacob a bath. The photographs admitted into evidence show extensive bruising and discoloration around and under Jacob's armpits. Cuhaciyan testified that she lifted Jacob into and out of the bathtub. Cuhaciyan testified she did not see any bruising and Jacob did not say he was hurt when she lifted him into and out of the bathtub. But Riggins testified that later that morning when he lifted Jacob up under his arms, Jacob was in pain. And when Jacob lifted his shirt, Riggins could see the extensive bruising under his arms.

Cuhaciyan contends the court erred in concluding the mother's household is detrimental to Jacob's physical, emotional, and mental well being. But the court explicitly found the mother's household poses a significant risk of harm because "the child was physically abused while in the mother's care" by her boyfriend. The court further found a "serious risk of harm . . . if the Mother continues to fail to safeguard the child." The evidence showed Cuhaciyan lived with her parents but she and Jacob spent

a lot of time with Best at his house. The record supports finding Jacob was not at risk while Cuhaciyan's mother took care of Jacob but while with Best, Cuhaciyan did not safeguard the child.

Cuhaciyan also claims substantial evidence does not support finding that Best intentionally broke Jacob's scooter. The Supplemental Findings state, "[T]he breaking of the scooter (EX. 222) could not have been done by sliding in the bed of a pick-up truck, but was done intentionally, by [Best]." There is no dispute the scooter was broken when Cuhaciyan and Best delivered the scooter on August 20. Cuhaciyan testified the scooter broke accidentally by sliding around in the back of the truck with the electrical equipment. But the photographs of the scooter clearly show is was broken in half. The undisputed evidence established Best attended the court hearing the day before when Cuhaciyan was found in contempt of the parenting plan and the court ordered her to make up the visitation time and pay attorney fees and costs. The evidence showed also Best was intimidating and harassing at the exchanges. Substantial evidence supports the finding that Best intentionally broke the scooter.

Cuhaciyan contends substantial evidence does not support finding that she engaged in extensive litigation and conflict with Riggins. The court found the "Mother has engaged in extensive litigation and conflict with the Father by bringing her boyfriend to exchanges and by interfering with the Father's visitation with his son."

Substantial evidence supports finding Cuhaciyan engaged in extensive litigation and conflict by insisting on bringing Best to exchanges and interfering with Riggins' visitation. There is no dispute that the court found Cuhaciyan in contempt of the parenting plan for failing to bring Jacob to regularly scheduled visits with Riggins. The

evidence showed the exchanges of Jacob went smoothly until discovery of the bruising on Jacob. Despite Riggins' request not to bring Best to the exchanges, Cuhaciyan continued to do so throughout the spring and summer of 2015. Riggins' stepmother testified that the exchanges in the spring and summer of 2015 "got increasingly agitated when Mr. Best was present." And the CASA and CPS recommended Best should not attend the exchanges.

Residential Plan

The court concluded a 50/50 residential plan was in the best interests of the child. Cuhaciyan argues the decision was manifestly unreasonable because the court ignored the CASA recommendation and "inexplicably" ordered a 50/50 parenting plan.

First, it is well established that a trial judge is not bound by the parenting plan recommendation of the CASA. In re Custody of Brown, 153 Wn.2d 646, 655-56, 105 P.3d 991 (2005). Second, the argument that "no one requested or recommended" a 50/50 parenting plan is without merit.

The record establishes that Riggins testified that he was requesting a 50/50 parenting plan. Without objection, Riggins introduced a proposed parenting plan that gives each parent equal time with the child.

> Q. (By [Riggins' attorney]) Mr. Riggins, you've proposed a parenting plan that would be week on/week off with Ms. Cuhaciyan; is that correct?
> A. That's correct.

Citing In re Marriage of Rossmiller, 112 Wn. App. 304, 309, 48 P.3d 377 (2002), Cuhaciyan argues the court abused its discretion by adopting a 50/50 residential plan and joint decision making because the court did not consider the statutory requirement

to find "[t]he parties have a satisfactory history of cooperation and shared performance of parenting functions" under former RCW 26.09.187(3)(b)(ii)(B) (1989).

Cuhaciyan's reliance on <u>Rossmiller</u> and former RCW 26.09.187(3)(b)(ii)(B) is without merit. In 2007, the legislature deleted the provision in RCW 26.09.187(3) that required courts to consider whether "[t]he parties have a satisfactory history of cooperation and shared performance of parenting functions" in determining residential provisions. LAWS OF 2007, ch. 496, § 603.

RCW 26.09.187(3)(b) allows the court to order a child to frequently alternate his residence between the parties' households if it is in the best interests of the child. RCW 26.09.187(3)(b) states:

> Where the limitations of RCW 26.09.191 are not dispositive, the court may order that a child frequently alternate his or her residence between the households of the parents for brief and substantially equal intervals of time if such provision is in the best interests of the child. In determining whether such an arrangement is in the best interests of the child, the court may consider the parties['] geographic proximity to the extent necessary to ensure the ability to share performance of the parenting functions.

Here, the court found that it was in Jacob's best interests to spend alternating weeks with Cuhaciyan and Riggins and the parties could make joint decisions about Jacob's health and education. Dr. Asher recommended Riggins spend more time with Jacob. The evidence shows that before the injuries to Jacob in late November 2014 and after Best stopped attending the exchanges in September 2015, there was no conflict. We conclude the court's decision to modify the parenting plan and adopt a 50/50 schedule for residential time was not a manifest abuse of discretion.

The "Order Re Modification/Adjustment of the Parenting Plan" prohibits Cuhaciyan from leaving Jacob alone with Best. But that prohibition is not in the

"Parenting Plan Final Order." We remand to expressly include a RCW 26.09.191 restriction prohibiting Best from having any unsupervised contact with Jacob.

RCW 26.09.285 requires designation of a custodial residential parent for purposes of state and federal law. RCW 26.09.285 states, in pertinent part:

> Solely for the purposes of all other state and federal statutes which require a designation or determination of custody, a parenting plan shall designate the parent with whom the child is scheduled to reside a majority of the time as the custodian of the child. However, this designation shall not affect either parent's rights and responsibilities under the parenting plan.

On remand, the court shall designate one of the parties as the custodial parent for purposes of state and federal law under RCW 26.09.285.

Child Support Order

Cuhaciyan contends the court abused its discretion by not allocating extraordinary childcare expenses in the amended child support order dated June 21, 2016. RCW 26.19.080 requires that extraordinary expenses "shall be shared by the parents in the same proportion as the basic child support obligation." Because the amended child support worksheets do not include the amount each party must pay for childcare and other expenses, we remand.

Cuhaciyan also contends the court erred by entering the July 7, 2016 "Amended Order of Child Support Final Order" after we accepted review. As a general rule, a trial court has the authority to hear and determine postjudgment motions on cases before an appellate court. RAP 7.2(e). But if the determination changes a decision being reviewed by an appellate court, then the trial court must obtain permission from the appellate court before formally entering a decision. RAP 7.2(e); Metro. Park Dist. Of Tacoma v. Griffith, 106 Wn.2d 425, 439, 723 P.2d 1093 (1986). Because the trial court

did not obtain permission before entering the July 7, 2016 Amended Order of Child Support and the record does not show why the court entered the July 7, 2016 order, we address only the amended child support order entered in June 2016. Nonetheless, we note that the July 7, 2016 child support worksheets also do not allocate extraordinary child support expenses.

Conclusion

We affirm the decision to modify the parenting plan but remand to impose restrictions under RCW 26.09.191 to prevent Ryan Best from having any unsupervised contact with Jacob and to designate a custodial residential parent for purposes of state and federal law under RCW 26.09.285. We remand the child support order to allocate uninsured medical and extraordinary expenses.[8]

WE CONCUR:

---

[8] We decline to award Riggins attorney fees on appeal. A party must devote a section of the brief to the fee request and requires more than a bald request for attorney fees. RAP 18.1(b); Thweatt v. Hommel, 67 Wn. App. 135, 148, 834 P.2d 1058 (1992).